AGRIBANK, F C B, as Successor to the Federal Land Bank of St. Louis, Plaintiff-Appellant, v. WALTER H. WHITLOCK *et al.*, Defendants-Appellees.

Fourth District   No. 4—93—0078

Argued August 24, 1993.—Opinion filed September 30, 1993.

Charles E. Theivagt (argued), of Gustine & Theivagt, Ltd., of Carrollton, for appellant.

Steven N. Mottaz (argued), of Thomas, Mottaz, Eastman & Sherwood, of Alton, for appellees.

JUSTICE KNECHT delivered the opinion of the court:

Walter and Mary Whitlock (the parents) signed a note and gave a mortgage on their property for the purpose of assisting their children in obtaining a loan to purchase a farm. The lender subsequently released the children from liability on the note and sought to foreclose on the parents' property. The trial court determined the parents were accommodation makers of the note and the release of the children released the parents from liability. We reverse.

## I. FACTS

Plaintiff, Agribank, F C B, is the successor to the Federal Land Bank of St. Louis, which conducted business as the Farm Credit Bank of St. Louis from 1983 to 1992. In the interest of simplicity, plaintiff and its predecessors will be referred to cumulatively as "plaintiff."

In the 1970's, the parents owned and operated a farm known as the Short farm. Their sons Darrell, Ronald and Richard were partners in a farming operation; they farmed rented land. In 1977, the sons and their wives (referred to collectively as the children) wished to acquire property known as the Meek farm for their farming operation. The Meek farm was available for $400,000. The children requested plaintiff to lend them the entire purchase price. Larry Thoele, then plaintiff's association manager, denied the request based on the children's own credit and the collateral available to them, but suggested a loan arrangement would be possible if the parents gave the Short farm as security. The Short farm was valued at approximately $320,000, and was security for an outstanding indebtedness to plaintiff in the amount of approximately $40,000. The parents were current on their loan payments and had not requested refinancing of their indebtedness. The parents did, after Thoele's suggestion, agree to help the children acquire a loan for the purchase of the Meek farm.

Plaintiff ultimately arranged two loans. "Loan 1" (loan No. 382076-1), for $214,200, was secured by the Short farm, and was taken out for the purpose of providing the children with funds for the down payment on the Meek farm. "Loan 2" (loan No. 382075-2), for $255,000, was secured by the Meek farm and provided the balance of the purchase price for the Meek farm. Although the parents did not request the consolidation of their previous indebtedness to plaintiff with the loan for the children's down payment on the Meek farm,

plaintiff included the parents' previous indebtedness ($41,720) in loan 1. The children signed the notes with respect to both loan 1 and loan 2; the parents signed only the note pertaining to loan 1. Walter testified he requested that the children sign the note pertaining to loan 1 because he wanted them to be liable for the repayment of the money they were receiving. Thoele confirmed the children signed this note "because that was what Walter wanted." Walter additionally testified he was hesitant to sign the loan documents and told Thoele he wanted some sort of security. According to Walter, Thoele told him there was nothing to worry about, it was a family matter and "we [meaning plaintiff] take care of them things."

Sometime after the loan documents were signed, the parents discovered their previous indebtedness had been included with the loan for the children's down payment in loan 1. Loan 1 required annual payments of $19,318.56. Either the parents or one of the children may have requested that the bank allocate the indebtedness between the children and the parents for the purpose of determining the amount of the annual payment attributable to each. However, the parents and children ultimately agreed, with the plaintiff's knowledge, that the parents would make annual payments substantially equal to the payments they had been making on their loan (approximately $5,000), and the children would make the balance of the payments.

In 1978 through 1983 the children made the annual payments for loan 2, and their portion of the payments for loan 1. The parents made their portion of the payments for loan 1. In 1984 the children defaulted on both loans; the parents made their portion of the loan 1 payment. In January 1985, to avoid foreclosure on the Meek farm, the children gave the plaintiff a deed in lieu of foreclosure in exchange for a release "of and from all manner of actions, causes and causes of action, suits, debts, sums of money." In 1985, the parents made their portion of the loan 1 payment. In 1986, plaintiff notified the children that they were personally liable on loan 1 and notified both the children and parents that loan 1 was delinquent. In January 1987, plaintiff filed this action against both the parents and the children to foreclose the mortgage on the Short farm. The defendants, collectively, alleged the release of the children "of and from all *** debts" released the children from liability on loan 1. The parents additionally alleged by releasing the children, plaintiff also released them due to their status as accommodation makers. Defendants filed a motion for summary judgment, which was granted. Plaintiff appealed and we affirmed, with one justice dissenting. (*Farm Credit Bank v. Whitlock* (1990), 202 Ill. App. 3d 609, 560 N.E.2d 460.) The supreme court re-

versed, finding the release was ambiguous and remanded for further fact finding on the issue of whether the parties intended for the release to release the children from liability on loan 1. *Farm Credit Bank v. Whitlock* (1991), 144 Ill. 2d 440, 581 N.E.2d 664.

On remand, after a bench trial, the trial court found the release was intended to release the children from all indebtedness to plaintiff, including that incurred in loan 1. The trial court additionally found the parents were accommodation makers and, as such, were discharged by the release of the children. Accordingly, the trial court entered judgment in favor of the children and parents. Plaintiff filed a post-trial motion alleging, *inter alia*, the parents were not discharged by the release of the children, because a provision in the mortgage of the Short farm contained a consent to the release of other parties. The trial court ruled this consent provision was inapplicable to the release of the children because the children were not parties to the mortgage.

Plaintiff appeals. Although, until this appeal, plaintiff has hotly contested the claim that its release of the children actually released them from liability on loan 1, it has now abandoned this argument. Conversely, although plaintiff has previously devoted little attention to whether the consent provision in the mortgage operated as a consent to the release of the children on the note, this argument is the focal point of its appeal. Plaintiff additionally appeals the trial court's determination the parents were accommodation makers.

## II. ACCOMMODATION STATUS

Plaintiff's first allegation of error concerns whether the trial court properly found the parents to be accommodation makers. We find no error.

■ This case is governed by the Uniform Commercial Code (Code) as adopted by the Illinois legislature. (Ill. Rev. Stat. 1991, ch. 26, par. 1—101 *et seq.*) The statute in effect at the time of the execution of the note, as well as at the time of the release of the children, provided "[a]n accommodation party is one who signs the instrument in any capacity for the purpose of lending his name to another party to it." (Ill. Rev. Stat. 1989, ch. 26, par. 3—415(1) (as amended by Pub. Act 87—582, §1, eff. January 1, 1992 (1991 Ill. Laws 2859, 2905-06)); see Ill. Rev. Stat. 1991, ch. 26, par. 3—419.) The receipt of value in exchange for the signing of an instrument does not automatically negate status as an accommodation maker. (Ill. Ann. Stat., ch. 26, par. 3—415(1), Illinois Code Comment, at 298 (Smith-Hurd 1963).) Rather, whether a party is an accommodation maker depends on a factual in-

quiry into whether the individual acted as a surety in signing the instrument. (*Godfrey State Bank v. Mundy* (1980), 90 Ill. App. 3d 142, 144, 412 N.E.2d 1131, 1134.) The courts are inclined to recognize one as an accommodation maker on a note when (1) the party did not participate in negotiations for credit or subsequent modifications of credit arrangements, (2) the evidence shows that the creditor was aware the party was not the one seeking the credit, (3) the party is not the one to whom proceeds are credited, and (4) the party has no interest in the purpose for which the proceeds are used. (*Aurora Firefighter's Credit Union v. Harvey* (1987), 163 Ill. App. 3d 915, 920, 516 N.E.2d 1028, 1032.) In *Harvey*, the court found C. J. Harvey was an accommodation maker of a note signed by himself and Delbert Dittman, in order for Dittman to obtain a loan from a credit union. The evidence established Dittman was a member of the credit union and Harvey was not; only members of the credit union were eligible to take out loans. Harvey did not participate in the loan negotiations and the proceeds were credited to Dittman. *Harvey*, 163 Ill. App. 3d at 920-21, 516 N.E.2d at 1032.

Similarly in *Holcomb State Bank v. Adamson* (1982), 107 Ill. App. 3d 908, 438 N.E.2d 635, the court found Grant Adamson to be an accommodation maker of a note signed by himself and his son-in-law. The son-in-law sought the loan, but could not obtain it without the signature of a comaker on the note. The bank suggested Adamson sign the note. The proceeds were credited to the son-in-law. *Holcomb*, 107 Ill. App. 3d at 911, 438 N.E.2d at 638.

In the present case, the first two factors clearly weigh in favor of finding the parents are accommodation makers. The parents did not participate in the negotiations for credit. Plaintiff was aware the parents were not the parties seeking the credit. In fact, plaintiff, as the lender in *Holcomb*, made the suggestion that the parents act as accommodation makers.

■ Plaintiff argues the third and fourth factors weigh in favor of finding the parents were not accommodation makers, because the parents' preexisting indebtedness to plaintiff was included in loan 1. Plaintiff argues since $40,000 of the proceeds of loan 1 were used to refinance the parents' preexisting indebtedness, the parents received a portion of the proceeds of loan 1 and cannot, therefore, claim accommodation status. We disagree. Although, under normal circumstances, a party receiving a portion of a loan will not be regarded as an accommodation maker of the note, the parents' net fiscal position with respect to the plaintiff, on the indebtedness incurred for their own purposes, did not change by virtue of the loan transaction. Al-

though 19% of the proceeds of loan 1 were used to pay off the parents' existing indebtedness, plaintiff was the holder of the note representing that indebtedness. It is uncontroverted that the parents were current on the payments on the existing mortgage and had not approached the bank regarding the possibility of refinancing that loan. Thoele, plaintiff's employee, testified the "only reason" the parents signed the note and mortgage was to obtain funds for their children to purchase the Meek farm. Thoele additionally testified the "sole purpose" of the loan was to enable the children to buy the Meek farm. Moreover, the evidence suggests the parents' preexisting indebtedness was included in loan 1 at the insistence of the bank, and not at the parents' request; the parents did not realize until sometime after the documents had been signed that the transaction had been structured in this way. The inclusion of the parents' loan in loan 1 was merely a substitution of new debt for old debt, structured for the convenience of the bank and caused no change in the parents' net fiscal position with respect to the plaintiff. (See *In re Estate of Williams* (1982), 109 Ill. App. 3d 828, 834-35, 441 N.E.2d 412, 417.) We do not believe a bank may defeat a party's ability to assert accommodation status by, at the bank's own instance, including the party's preexisting indebtedness to the bank in the loan for which they are to act as a surety. For the foregoing reasons, we do not find the trial court erred in finding the parents were accommodation makers.

### III. Effect Of The Release Of The Children

■ We now turn to the issue of the effect of the release of the children upon the liability of the parents to plaintiff. Under the statute in effect at all times relevant to this case, an accommodation maker was discharged from liability if the holder of the note released the accommodated party from liability, without first obtaining the consent of the accommodation maker or expressly reserving its rights against the accommodation maker. (Ill. Rev. Stat. 1989, ch. 26, par. 3—606(1)(a).) An accommodation maker is a surety, and the defenses set forth in section 3—606 of the Code are suretyship defenses. The extent of the discharge is the extent that the creditor impairs the accommodation party's right of recourse. (J. White & R. Summers, Uniform Commercial Code §13—13, at 656 (3d ed. 1988).) The parents would not have recourse against the children for the portion of the loan attributable to the parents' own indebtedness; thus, that portion of the loan would not be discharged by plaintiff's release of the children; the parents remained liable on this portion of the loan, despite plaintiff's release of the children. Accordingly, we find the trial court

erred in finding the release of the children released the parents from liability on the portion of the loan attributable to the discharge of the parents' preexisting indebtedness to plaintiff. For the reasons set forth below, we additionally determine the trial court erred in finding the release of the children released the parents from liability on the portion of the loan attributable to the children.

## A. *Consent*

Whether plaintiff's release of the children caused the parents, as accommodation makers, to be discharged from liability on the portion of the loan attributable to the children's purchase of the Meek farm turns upon whether the parents consented to the release of the children. In order to resolve this issue, we must determine whether the consent provision located in the mortgage was a valid consent provision, and whether it operated as consent to the release of any parties liable on the indebtedness, including those who were not parties to the mortgage. We find the trial court erred in determining the parents did not consent to the release of the children on the note.

The consent provision in the mortgage is a valid consent provision. Comment 2 to section 3—606 of the Code provides consent may be given in advance, and is commonly incorporated in the instrument. (Ill. Ann. Stat., ch. 26, par. 3—606(1), Uniform Commercial Code Comment, at 411 (Smith-Hurd 1963).) In *Jacobson v. Devon Bank* (1976), 39 Ill. App. 3d 1053, 1056, 351 N.E.2d 254, 256, the appellate court determined a consent provision, similar to the one appearing in the mortgage signed by the parents, was an unambiguous consent. In the consent provision, the guarantor agreed his liability would not be "affected or impaired by *** any sale, pledge, surrender, compromise, release, renewal, extension, indulgence, alteration, exchange, change in or modification" of any liability of the debtor both express and implied. (*Jacobson*, 39 Ill. App. 3d at 1056, 351 N.E.2d at 256.) The appellate court noted it was difficult to conceive of a broader or more inclusive form of guaranty. The court additionally noted the consent provision was unambiguous and the court was obligated to give effect to the clear and unambiguous language which the parties ratified and adopted. (*Jacobson*, 39 Ill. App. 3d at 1056, 351 N.E.2d at 256.) Accordingly, the court found the guarantor had agreed his liability would be unaffected by renewals or extensions of repayment of the debt, and the guarantor, therefore, remained liable, even though the guarantor was not a party to the renewals and extensions.

■ The consent provision in the parents' mortgage in the present case provides:

> "that mortgagee [(the bank)] may extend and defer the maturity of and renew and reamortize said indebtedness, release from liability any party liable thereon, and release from the lien hereof portions of property covered hereby, without affecting the priority hereof or the liability of the mortgagors or any other party for the payment secured hereby."

This provision, like the provision in *Jacobson*, is quite broad and inclusive. We find no ambiguity in this provision; rather, we find it contains an unambiguous consent to the release by the mortgagee, plaintiff bank, of any party liable on the indebtedness.

The location of the consent provision—in the mortgage document, rather than the loan document—does not preclude its application to the note on loan 1. The Code provides the terms of an instrument may be modified or affected by any other written agreement executed as part of the same transaction. (Ill. Rev. Stat. 1989, ch. 26, par. 3—119 (subsequently replaced by Ill. Rev. Stat. 1991, ch. 26, par. 3—117).) The separate writing is most commonly an agreement creating or providing for a security interest such as a mortgage. (Ill. Ann. Stat., ch. 26, par. 3—119, Uniform Commercial Code Comment, at 85 (Smith-Hurd 1963).) In the present case it is undisputed that the note and mortgage were executed as part of the same transaction. Consequently, we find the consent provision in the mortgage document was a valid consent to the release, by the mortgagee bank, of parties to the indebtedness.

We additionally find the consent to the release of parties liable on the indebtedness was not limited to only those individuals who were also parties to the mortgage. The trial court, by contrast, found the consent provision was not a consent to the release of the children, since the children were not parties to the mortgage. Specifically, the trial court held:

> "Paragraph 10 of the mortgage provides that the mortgagee may 'release from liability any party liable thereon,' and since the Whitlock children were not parties to the mortgage, the parents did not consent to the release of the children on the underlying note."

However, viewing the consent provision in its entirety, it is clear "thereon" refers back to "indebtedness." A note is proof of a promise to pay an indebtedness. A mortgage provides for a security interest in realty to secure the repayment of the indebtedness. (See *Petkus v. St. Charles Savings & Loan Association* (1989), 182 Ill. App. 3d 327, 330,

538 N.E.2d 766, 768.) Since the consent provision was not limited to parties to the mortgage, but included any party liable on the indebtedness, we must conclude the parents consented to the release of the children who were liable on the indebtedness. Since the parents consented to the release of the children, plaintiff's release of the children did not release the parents from liability on the note. Accordingly, the parents remain liable to the plaintiff for satisfaction of the debt. Upon satisfaction of the debt the parents may exercise their right of reimbursement from the children for the portion of the loan attributable to the children. Ill. Ann. Stat., ch. 26, par. 3—605, Uniform Commercial Code Comment 3,.at 149 (Smith-Hurd Supp. 1992).

## B. *Other Arguments In Support Of The Trial Court's Decision*

The parents have advanced several other arguments in support of the trial court's ruling that the release of the children discharged the parents from liability on the portion of the note attributable to the children. Since the appellate court may affirm the trial court on any basis supported by the record, we will consider these arguments. *Material Service Corp. v. Department of Revenue* (1983), 98 Ill. 2d 382, 387, 457 N.E.2d 9, 12.

### 1. Inconsistencies in Plaintiff's Position

■ The parents first allege plaintiff's conduct was inconsistent with its position that the clause in the mortgage document was a consent to its release of the children on the note. Sometime after the plaintiff released the children, it notified them that the release did not actually release them from all of their liability to plaintiff, but only from their liability on the note secured by the Meek farm (loan 2). Three of the children requested to be released from liability on the note secured by the Short farm as well (loan 1). Plaintiff sent letters to the parents and the other children stating Ronald, Patricia, and Helen had requested to be released from liability on the note, and the parents and the other children would have to sign consent forms, which were included with the letters, before the requests would be considered. The parents and other children refused to give their consent. The parents argue plaintiff's request for consent to the release of Ronald, Patricia and Helen indicates plaintiff did not believe the provision in the mortgage operated as a consent to its release of the children from liability on the note.

In making this argument, the parents essentially request this court to look to extrinsic evidence of the conduct of the parties in or-

der to interpret the meaning and effect of the consent provision. Where a contract provision is unambiguous, the court must give effect to the plain language of the provision and cannot consider the extrinsic evidence to determine whether the parties may have intended the provision to have another meaning. (See *American National Bank v. Warner* (1984), 127 Ill. App. 3d 203, 206-07, 468 N.E.2d 184, 186; *Village of Grandview v. City of Springfield* (1984), 122 Ill. App. 3d 794, 797, 461 N.E.2d 1031, 1035.) The consent provision in the mortgage unambiguously sets forth the parents' consent to the mortgagee bank's release of any party liable on the indebtedness. Accordingly, extrinsic evidence may not be considered to interpret the consent provision.

## 2. Resulting Trust and Equitable Lien

■■ The parents next allege, since they "advanced" $160,000 of the purchase price of the Meek farm (by taking out loan 1 for the down payment), either a resulting trust or an equitable lien arose in their favor, and by accepting a deed in lieu of foreclosure and releasing the Meek farm as collateral for the children's loan, the bank impaired the collateral for the resulting trust or equitable lien, and such impairment of collateral effected a release of the parents due to their status as accommodation makers.

Circumstances giving rise to a resulting trust do not appear in the present case, because the parents were merely loaning their credit to the children, they did not intend to invest in the Meek farm. A resulting trust arises *pro tanto* when two persons supply the consideration for the purchase of the property and cause the property to be conveyed to one of the parties. (*Hanley v. Hanley* (1958), 14 Ill. 2d 566, 571-72, 152 N.E.2d 879, 882; *Paluszek v. Wohlrab* (1953), 1 Ill. 2d 363, 369, 115 N.E.2d 764, 768.) In such a case, the title holder holds the property subject to a resulting trust in favor of the other party to the extent of that party's interest in the property. (*Carrillo v. O'Hara* (1948), 400 Ill. 518, 532, 81 N.E.2d 513, 520.) However, a resulting trust is inconsistent with a loan. (*Zack Co. v. Sims* (1982), 108 Ill. App. 3d 16, 28, 438 N.E.2d 663, 672.) Where one party lends money to another for the purchase of property, he cannot later claim the benefit of a resulting trust in the property. (*Fields v. Fields* (1953), 415 Ill. 324, 329, 114 N.E.2d 402, 404.) Thus, in the present case, since the parents did not supply a portion of the purchase price because they intended to invest in the Meek farm on their own behalf, but were providing a loan to the children, they are now precluded from claiming a resulting trust in the property.

While the parents might successfully argue they had an equitable lien on the Meek farm, the impairment of their equitable lien in the deed-in-lieu-of-foreclosure transaction does not give rise to the discharge of the parents' liability to plaintiff. An equitable lien arises in two situations. First, the lien arises where the parties express in writing their intention to make real or personal property, or some fund, the security for a debt, or where there has been a promise to convey or assign property as security. Second, equity recognizes such a lien without an express agreement between the parties, which arises wholly from general considerations of fairness and justice. (*Paine/Wetzel Associates, Inc. v. Gitles* (1988), 174 Ill. App. 3d 389, 393, 528 N.E.2d 358, 360.) An equitable lien is not a debt or a right to property, but a remedy for a debt. A creditor in whose favor such a lien exists may proceed against the property in an equitable action, resulting in the sale of the property to satisfy the debt. (*Watson v. Hobson* (1948), 401 Ill. 191, 201, 81 N.E.2d 885, 890.) The record does not reflect the presence of an agreement between the children and parents or promise by the children that the Meek farm would be security for the parents' "loan" of their credit to the children. Thus, an equitable lien would arise only from general considerations of fairness and justice. Assuming equity would, under the circumstances of this case, confer an equitable lien on the Meek farm upon the parents, had the parents paid the indebtedness, they may have been able to initiate a legal action to have their equitable lien determined and cause the Meek farm to be sold and the proceeds applied to reimburse them for the amount expended to pay off the loan. Since the children, by conveying the Meek farm to plaintiff in a deed-in-lieu-of-foreclosure transaction, effectively precluded the parents from asserting an equitable lien on the Meek farm, the parents might have some recourse against the children. However, the parents have cited no authority to support an argument that plaintiff was responsible for ensuring the parents' potential equitable lien remained intact and plaintiff's failure to do so discharged the parents from their liability to plaintiff. Accordingly, even if the parents were able to establish an equitable lien on the Meek farm, the deed-in-lieu-of-foreclosure transaction did not release the parents from their liability to plaintiff.

### 3. Good Faith

■ Finally, the parents allege plaintiff's claim that it obtained their consent is in contravention of the good-faith provision of the Code. (Ill. Rev. Stat. 1991, ch. 26, par. 1—203.) The parents allege the inclusion of a consent provision in the mortgage, if it operates to con-

sent to the mortgagee's release of the children on the note, was in violation of the good-faith provisions of the Code, because plaintiff knew the parents intended for the children to be responsible for the repayment of the loan and, when the parents manifested a desire for some sort of security, were reassured by plaintiff that none was needed as this was a family matter. The consent provision in the mortgage is a provision sanctioned by the Code. We do not believe, absent factors not present in this case, the good-faith provision of the Code may be utilized to preclude the inclusion of a provision which is permitted by the Code.

Section 1—203 of the Code provides "[e]very contract or duty within this Act imposes an obligation of good faith in its performance or enforcement." (Ill. Rev. Stat. 1991, ch. 26, par. 1—203.) "Good faith" is defined as "honesty in fact in the conduct or transaction concerned." (Ill. Rev. Stat. 1991, ch. 26, par. 1—201(19).) However, the Code additionally provides consent to the release of the accommodated party may be obtained in advance. (Ill. Ann. Stat., ch. 26, par. 3—606, Uniform Commercial Code Comment, at 411 (Smith-Hurd 1963).) Commentators have noted the importance of suretyship defenses have greatly diminished as they may be waived and a waiver is commonly obtained in advance. Ill. Ann. Stat., ch. 26, par. 3—605, Uniform Commercial Code Comment 2, at 149 (Smith-Hurd Supp. 1992).

We do not believe we can construe the duty of good faith imposed by the code to prevent the lender from inserting a provision in the instrument or accompanying documents, when the use of such a provision has been expressly sanctioned by the Code. Rather, we believe the effect of the good-faith obligation in the context of the advance consent to release the accommodated party, is to place the obligation upon the lender to act in good faith when releasing the accommodated party.

As a practical matter in most accommodation situations, the accommodation party intends only to lend his credit so the accommodated party may obtain a loan. Both the accommodated party and accommodation maker intend, at the time of the signing of the contract, that the accommodated party will make the payments of the loan. The lender who is aware one individual is an accommodation maker may be cognizant that the accommodation maker merely intends to help the accommodated party obtain a loan, but has no expectation that he (the accommodation maker) will be called upon to satisfy the indebtedness. If we were to hold the good-faith provision of the Code prevented the lender from obtaining the accommodation maker's advance

consent to the release of the accommodated party under these circumstances, we would effectively prevent a lender from obtaining consent in advance, thus nullifying the Code's provision for such a practice.

While many accommodation parties may be surprised to learn the consent provisions in the instrument or accompanying documents essentially preclude them from asserting suretyship defenses and render little difference between their liability and the liability of the accommodated party, such consent provisions are sanctioned by the Code and routinely utilized by lenders. A bold heading, to draw the accommodation maker's attention to the consent provision and a plain language explanation of its effect, may be warranted to fully advise accommodation parties of the scope of their liability; however, the determination of whether to require such measures rests with the legislatures and shall not be retroactively imposed by this court.

### IV. Conclusion

For the foregoing reasons the order of the circuit court of Greene County is reversed. This matter is remanded and the circuit court is directed to enter judgment consistent with this opinion.

Reversed and remanded with directions.

COOK and GREEN, JJ., concur.