MALCOLM A. CHANDLER, Plaintiff-Appellee, v. MAXWELL MANOR NURSING HOME, INC., *et al.,* Defendants-Appellants.

First District (5th Division)   Nos. 1—93—4023, 1—93—4087 cons.

Opinion filed May 17, 1996.

Richard L. Hoffman, of Palatine, for appellants.

Malcolm A. Chandler, of Chicago, appellee *pro se.*

JUSTICE GORDON delivered the opinion of the court:

Plaintiff, Malcolm A. Chandler, brought this action to recover fees for legal services allegedly rendered on behalf of defendant Maxwell Manor Nursing Home, Inc. (Maxwell Manor). At the conclusion of a bench trial, the court entered judgment in favor of the plaintiff and found that both defendants, Maxwell Manor and Joe-Ann McClandon, were liable as principals.

On appeal, the defendants argue that the trial court erred in awarding fees to the plaintiff where the evidence showed that many of the plaintiff's services were not requested or were rendered after the plaintiff "suspended" his representation of Maxwell Manor due to defendants' nonpayment of fees. Defendant McClandon also argues that the trial court erred in finding her principally liable with Maxwell Manor for plaintiff's fees. She contends that she was a gratuitous surety of Maxwell Manor and that she was relieved of any liability as a surety when the plaintiff increased his hourly rate.

At trial, the plaintiff introduced into evidence a written agreement dated May 25, 1990, addressed to JoeAnn McClandon at Maxwell Manor. The letter acknowledged McClandon's request that

the plaintiff represent Maxwell Manor, discussed the types of services that the plaintiff would provide, set forth plaintiff's billing procedures and hourly rate ($150 per hour), sought payment of a retainer fee, and requested that the letter be signed by McClandon and "any co-owners." With respect to liability for payment, the letter provided as follows:

"The persons responsible for the fees and other charges must include not only the legal entity that operates the home, but every individual holding an interest of twenty percent or more, directly or through other individuals and entities, in the operator or the underlying real estate, or both.

\*\*\*

You may wish to have the advice of your personal attorney before agreeing to the terms of this letter, and I encourage you to submit it to him or her for examination. When you and any co-owners are ready to sign a copy of it for my files, please return it with the required deposit so that my work may begin with the least possible delay."

Signature lines were provided in the lower left-hand corner of the letter. Above those signature lines was the following language:

"The undersigned owners of the nursing home known as Maxwell Manor \*\*\* have read and do agree to the terms of the foregoing letter, including the terms of our individual responsibility for fees and charges incurred in connection with legal services to it."

Below the first signature line was typed the name "JoAnne McLandon." On that line appeared the signature of "JoeAnn McClandon." The remaining signature lines were blank.

Also introduced into evidence were copies of plaintiff's statements for legal services, totalling $21,718 for over 120 hours of work, dated September 3, 1992; October 5, 1992; November 2, 1992; and December 11, 1992; and a copy of a letter from the plaintiff dated October 5, 1992. All of these documents were addressed to Mrs. Joe-Ann McClandon. Below her name appeared the name of Maxwell Manor. In the October 5, 1992, letter, the plaintiff stated that his September billing statement for services rendered in August had not been paid and discussed the need for prompt payment. Attached to that letter was plaintiff's October billing statement for the past-due fees and fees for legal services performed in September. The letter concluded by stating "work on Maxwell Manor's cases will be suspended on Friday, October 9th, pending receipt of full payment of the enclosed statement." Although plaintiff's fees were not paid, he performed an additional 7.25 hours of services during the month of October, 3.25 hours on October 6 and 4 hours during the period of October 19 to 30. Plaintiff's billing statement dated November 2,

1992, reflected these services. On December 11, 1992, the plaintiff sent a billing statement for services he rendered in August and September of 1991 totalling 13.25 hours that had not been billed previously due to Maxwell Manor's "financial constraints."

At trial, the plaintiff explained his billing procedures. He testified that he kept time records on legal matters in his diary, transferred that information onto ledger sheets and issued billing statements using the ledger sheets. The plaintiff introduced into evidence copies of portions of his 1992 diary entries and corresponding ledger sheets with respect to the services he performed on behalf of Maxwell Manor. He stated that in 1991 he prepared a report that discussed various legal actions that Maxwell Manor could file against various governmental agencies to recover monies for services rendered to certain Maxwell Manor residents. That report was entered into evidence. The plaintiff stated that in 1992 he represented Maxwell Manor before the Chicago department of health and the Illinois Department of Public Health with regard to alleged regulatory violations. The most serious charges involved an alleged homicide of a resident at Maxwell Manor by another resident and the drowning death of a third resident. With respect to those charges, the plaintiff communicated by telephone and in writing with the city and state agencies and with personnel at Maxwell Manor; examined documents, complaints, correspondence and medical files; prepared summaries of charges, evidence and defenses; performed legal research and prepared trial briefs; attended prehearing conferences and discussed settlement options; and attended administrative hearings where he presented testimonial and documentary evidence. In support of the various billing entries made relative to these services, the plaintiff admitted into evidence copies of follow-up letters, reports, summaries, notes and other correspondence he prepared.

With respect to the four hours of services performed after October 9, 1992, the date he threatened to suspend legal representation of Maxwell Manor, the plaintiff testified that he had a telephone conversation with legal counsel for the City of Chicago on October 22, 1992, in which they reviewed a previously held prehearing conference. As evidenced by plaintiff's billing statement dated November 2, 1992, the plaintiff had an additional conversation with the city's legal counsel on October 30, 1992, concerning the pending charges as well as new charges arising from the city's inspection of Maxwell Manor on September 21, 1992. That billing statement also indicated that the plaintiff had a telephone status conference with state officials on October 19, 1992, and that he made telephonic reports about those calls to personnel at Maxwell Manor. Plaintiff also

introduced a copy of a letter addressed to him from the law department of the City of Chicago dated November 3, 1992, regarding violations cited as a result of the city's September 21, 1992, inspection of Maxwell Manor and a copy of his letter dated November 6, 1992, to Ruth Pearce, the administrator at Maxwell Manor, transmitting the city's November 3 letter. The plaintiff rested without calling any additional witnesses.

The defendants called Donald F. Hemmsch, an attorney, who testified that in the fall of 1992 he negotiated a settlement with the Illinois Department of Public Health on behalf of Maxwell Manor with respect to the homicide charge pending. Hemmsch testified that he expended a total of between 5 to 10 hours to resolve this matter and that in doing so he conversed with various representatives of that department and Maxwell Manor and reviewed medical records and history. Hemmsch further testified that he did not need to prepare a synopsis of the case or to collate any materials in preparation for the settlement discussions.

JoeAnn McClandon testified concerning her relationship to Maxwell Manor, a not-for-profit corporation. McClandon stated that she was not a board member for Maxwell Manor. She stated that she was a partner in BMJ, the partnership that owned the building leased to Maxwell Manor. McClandon identified the lease between Maxwell Manor and BMJ and identified the signatures on that lease as those of Carol Buford, who signed as general partner of BMJ, and Roy T. Cogdell, who signed as secretary of Maxwell Manor.

McClandon testified that she contacted the plaintiff in August of 1992 and asked him to attend settlement negotiations between Maxwell Manor and the Department of Public Health concerning the murder of a resident at Maxwell Manor by another resident. She stated that she only asked the plaintiff to "sit with" Maxwell Manor's representatives "while they were having the negotiations." McClandon stated that she also contacted the plaintiff around August 19, 1992, regarding the State's request that Maxwell Manor turn over its "license" in exchange for a "conditional license." According to McClandon, the plaintiff agreed to call the Illinois Department of Public Health regarding the licensing change and to determine whether that department had conducted an "exit interview" at Maxwell Manor "to make sure our rights were not violated." McClandon denied asking the plaintiff to do anything other than sit in on the negotiation session, answer her question regarding the conditional license and check on the lack of an "exit interview."

McClandon further testified that in April of 1991 she had a conversation with the plaintiff concerning Maxwell Manor's interest

in filing a lawsuit against the Department of Public Health. She stated that she told him she did not want to pursue any litigation. With respect to entries made on plaintiff's billing statement regarding conversations between the plaintiff and McClandon, McClandon admitted having a conversation on August 20, 1992; denied having a conversation on August 26, 1992, stating she left for Detroit, Michigan, on that date; denied having a conversation on August 27, 1992, stating she was in Detroit on that date; admitted having a conversation on September 1, 1992; denied having conversations on September 3 and 9, 1992, stating she was in Orlando on those dates; could not recall whether she did or did not have conversations on September 16 and 17, 1992; denied having a conversation on September 22, 1992, even though she was in Chicago on that date; admitted to a conversation on September 23, 1992; denied having a conversation on September 30, 1992, stating she was in Orlando from September 24 to 30, 1992; admitted having a conversation on October 6, 1992; and denied having a conversation on October 22, 1992, stating she was in Orlando.

On cross-examination, McClandon admitted that she did not keep a diary with contemporaneous entries showing when conversations occurred between the plaintiff and herself. She also admitted that she did not keep informed as to the status of various disciplinary proceedings involving Maxwell Manor and may not have seen all of the correspondence sent by the plaintiff to Maxwell Manor.

Ruth Pearce testified that she began employment at Maxwell Manor in September of 1990 as director of quality control and became employed as its administrator in August of 1992. She testified that she had handled hundreds of nursing home violation charges and that after receipt of a notice of violation by the State she would respond by preparing a plan of correction to assure the State that the facility was in compliance and that the violations had been corrected. She stated that she was familiar with prehearing conferences and explained them as being an opportunity for the facility to bring evidence, to negotiate fines and to resolve pending matters. According to Pearce, violations were frequently resolved at prehearing conferences.

Pearce further testified that she prepared a plan of correction regarding the violations involved with respect to the murder at Maxwell Manor. She stated that she had conversations with the plaintiff regarding that violation and indicated that those conversations may have occurred on September 10 and 14, 1992. She did not remember having conversations on September 15, 16, or 17, 1992; said it was unlikely that she talked to the plaintiff on October 19,

1992, and did not recall whether she talked to him on October 23, 1992. Pearce identified a security log and an entry made therein by the plaintiff indicating he was on the premises of Maxwell Manor on September 17, 1992, from 11:30 a.m. to 2 p.m. Pearce stated that she and several employees at Maxwell Manor met with the plaintiff on that day to discuss the upcoming conference with the Chicago department of health regarding the murder violation. She stated that the meeting lasted one-half hour; that she met with the plaintiff for an additional half hour; and that the plaintiff may have been in the building until 2 p.m. (The plaintiff's billing statement dated October 5, 1992, charged 3$^1$/$_2$ hours of time for his travel to and attendance at the meeting.)

On redirect, Pearce testified concerning a letter she had written to the plaintiff on December 18, 1992, which was admitted into evidence. In that letter she indicated that she "never stated that Maxwell Manor no longer desired [plaintiff's] services" and referred plaintiff to his October 5, 1992, letter in which he "relieved [him]self of [his] duties at Maxwell Manor."

At the conclusion of Pearce's testimony, the defense was permitted to recall JoeAnn McClandon. Her testimony was directed toward plaintiff's billing entry for August 24, 1991, involving an alleged conference between the plaintiff and McClandon at Maxwell Manor to examine and review documents and discuss Maxwell Manor's pursuit of legal actions against various governmental agencies. McClandon denied that such a meeting occurred on that date because August 24, 1991, was a Saturday and she did not work on Saturdays. On cross-examination, when asked whether she met with the plaintiff from 12 noon until 5 p.m. on that date, McClandon responded in the negative and referred to an airline ticket that indicated she returned from Orlando, Florida, at 8:50 a.m. on that date.

In rebuttal, the plaintiff referred to his practice of making diary entries. He testified that according to an entry made on August 24, 1991, he met with McClandon from 12 noon until 5:30 p.m.; that he incurred 90 miles of mileage on his automobile on that date; and that he incurred a parking charge of $6. He further testified that he did not know whether McClandon arrived from Florida on that date but that he did in fact meet with her during the time period reflected in his diary. Plaintiff's diary entry for the date of August 24, 1991, and his parking receipt for that $6 charge on August 24, 1991, were admitted into evidence. The parking receipt for the garage near his office indicated that he arrived at 9:18 a.m. and left at 11:43 a.m.

On cross-examination, the plaintiff was asked why the diary entry for August 24, 1991, was in blue ink except for the "12:00 noon"

entry, which was in pencil. The plaintiff indicated that he may have used any writing utensil available when he wrote in the noon entry. He also indicated that he could have put in the noon time at a later date. He stated that the 5:30 p.m. entry, which was part of the inked-in section, would not have been written until after that time.

Based upon the testimony discussed above, the trial court entered judgment in favor of the plaintiff in the sum of $27,096.84 together with costs and interest. Included in the court's judgment order were the following findings:

"1. The plaintiff was a wholly credible witness in his own behalf and his documentation fully supports his claim.

2. The credibility of defendant McClandon and Mrs. Pearce was impaired by the uncertainty of their testimony and was not strong. The credibility of defendants' other witness was poor.

3. The quality of plaintiff's work for defendants was high and at least justified the amounts charged for it. His time records were contemporaneously maintained and supported the amount of his claims.

4. The written contract signed by plaintiff and defendant McClandon concerning work to be done by the plaintiff created direct obligations on the part of both defendants as principals and not a mere suretyship obligation on the part of defendant McClandon. McClandon had knowledge of and by her conduct consented to an increase of plaintiff's hourly rates in 1991."

In a bench trial, where the testimony is conflicting, the trial court's findings will not be disturbed unless they are against the manifest weight of the evidence. *E.g.*, *Bazydlo v. Volant*, 164 Ill. 2d 207, 647 N.E.2d 273 (1995); *Trustees of Sheet Metal Workers Local No. 1 Welfare Trust v. AAA-Northgate, Inc.*, 269 Ill. App. 3d 919, 647 N.E.2d 302 (1995); *Levy v. Markal Sales Corp.*, 268 Ill. App. 3d 355, 643 N.E.2d 1206 (1994). A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings are unreasonable, arbitrary and not based on the evidence. *E.g.*, *Allstate Contractors, Inc. v. Marriott Corp.*, 273 Ill. App. 3d 820, 652 N.E.2d 1113 (1995); *Horace Mann Insurance Co. v. Brown*, 236 Ill. App. 3d 456, 603 N.E.2d 760 (1992). In making that determination, this court may not reconsider the evidence or reassess the witnesses' credibility or demeanor. *Howard v. Zack Co.*, 264 Ill. App. 3d 1012, 637 N.E.2d 1183 (1994); see *Levy v. Markal Sales Corp.*, 268 Ill. App. 3d 355, 643 N.E.2d 1206. It is well established that credibility determinations should be left to the trier of fact, who is in the position to see the witnesses, observe their demeanor, and assess the relative credibility of witnesses where there is conflicting testimony on issues of fact. *Tampam Farms, Inc. v. Supervisor of Assessments*,

271 Ill. App. 3d 798, 649 N.E.2d 87 (1995); *Fritch v. Fritch*, 224 Ill. App. 3d 29, 586 N.E.2d 427 (1991); *In re Marriage of Malec*, 205 Ill. App. 3d 273, 562 N.E.2d 1010 (1990).

As their first contention of error, the defendants argue that the judgment amount was erroneous since many of the fees sought by the plaintiff were for the performance of services not requested and for services rendered after the plaintiff's October 5, 1992, letter in which he stated that he would "suspend" his representation of Maxwell Manor on October 9, 1992, "pending receipt of full payment of the enclosed statement." The defendants rely on the testimony of McClandon and Pearce that the plaintiff was hired only to attend settlement negotiations concerning Maxwell Manor's alleged regulatory violations and the State's issuance of a "conditional license" to it. The defendants also rely on testimony by those witnesses that several alleged conversations and/or meetings never occurred or did not last the length of time alleged by the plaintiff. Finally, the defendants argue that plaintiff's preparation of certain documents, such as a federal civil rights lawsuit and a plan of correction, were unnecessary and that the amount of time expended by the plaintiff in preparation for the prehearing conferences was exorbitant in view of Donald Hemmsch's testimony that he only expended 5 to 10 hours to negotiate a settlement between that agency and Maxwell Manor in January of 1993.

The defendants concede that this argument primarily rests on the trial court's credibility determinations. They argue that the trial court's determination that the plaintiff was the more credible witness was against the manifest weight of the evidence since the plaintiff's testimony was impeached with respect to the meeting alleged to have occurred on August 24, 1991, between the plaintiff and McClandon at Maxwell Manor and that, as such, the trial court erred in relying on any of the plaintiff's testimony. With regard to that meeting, the defendants contend that the plaintiff's diary mileage notation of 90 miles was not factually supportable.[1] They also contend that the plaintiff gave contradictory accounts of the use of his car on the day of the alleged meeting by testifying that he went home after

---

[1]According to the defendants, the plaintiff stated that the round-trip distance from his office to his home was 70 miles. The defendants contend that, if the court takes judicial notice that the distance between Maxwell Manor and the plaintiff's office is $6^1/2$ miles, then the " 'correct' [mileage] notation" in plaintiff's diary should have been 83 miles and not 90 miles. The defendants also suggest, without evidentiary support, however, that the plaintiff could not have picked up his car at 11:43 a.m., as indicated on his parking ticket, and arrived for the conference 17 minutes later.

he picked up his car from the parking garage whereas during summation he stated that he picked up his car from the garage and then drove to Maxwell Manor for the meeting.

■ It is true that the evidence regarding the August 24, 1991, meeting was conflicting. McClandon testified that it did not occur. However, her testimony was not corroborated by any diary entries or by her testimony that she departed from Orlando, Florida, in route to Chicago at 8:50 a.m. on the morning of August 24 since that flight time would not have precluded her from attending a meeting from 12 noon until 5:30 p.m. on that date. The plaintiff, on the other hand, testified that the meeting occurred and corroborated that testimony with diary and ledger entries. While the record shows that the plaintiff testified at one point that he went home after picking up his car at 11:43 a.m., suggesting that he did not drive to Maxwell Manor as claimed, he later disavowed any such statement and insisted that he had driven to Maxwell Manor after picking up his car. He noted that corroboration for that claim could be found in his billing statement and ledger entry. Moreover, despite any conceived contradiction in plaintiff's testimony and even assuming the plaintiff misstated the mileage from his office to Maxwell Manor by seven miles as the defendants argue,[2] these inconsistencies would not compel the trial court to conclude that the August 24, 1991, meeting did not occur or, more importantly, would not discredit plaintiff's trial testimony on the whole. The trial court reviewed plaintiff's billing statements, his work product and other supporting exhibits. The court also viewed the witnesses, assessed their relative credibility where conflicting testimony was presented, and specifically found that the plaintiff was wholly credible and that the defense witnesses' credibility was poor. In reviewing the record, we cannot say that the trial court's determination was unreasonable or arbitrary nor can we say that an opposite conclusion is clearly evident.

The issue of plaintiff's entitlement to reimbursement for services performed after his October 5, 1992, letter in which he stated that he would "suspend" his work on Friday, October 9, 1992, also depends upon credibility determinations. These services, which accounted for only four hours out of a total of over 120 hours, involved several telephone conversations between the plaintiff and legal counsel for the city and state regulatory agencies and plaintiff's telephonic reports thereof to McClandon and Pearce, persons who could have questioned plaintiff's continued representation of Maxwell Manor. McClandon denied and Pearce could not recall or said it was unlikely

---

[2]See footnote 1 *supra.*

that post-October 9, 1992, telephone conversations with the plaintiff occurred. Neither individual testified, however, that she had terminated the plaintiff as Maxwell Manor's legal counsel in October of 1992. The only written communication to the plaintiff from Maxwell Manor regarding the issue of termination occurred in a letter dated December 18, 1992, written by Pearce. In that letter, Pearce stated that the plaintiff "relieved [him]self of [his] duties at Maxwell Manor." She also denied stating that "Maxwell Manor no longer desired [plaintiff's] services." This letter presents little support for defendants' contention that the plaintiff was terminated and, as such, was not entitled to reimbursement for four hours of services performed after October 9, 1992. Pearce's letter denying plaintiff's termination by Maxwell Manor coupled with the testimonial denials by McClandon and Pearce of their alleged telephone conversations with the plaintiff, which the trial court determined to be weak, do not require a conclusion opposite to that reached by the trial court.

In addition to defendants' joint arguments, defendant McClandon argues that the trial court erred in holding her liable as a principal debtor for the plaintiff's legal fees. McClandon argues that she was liable as a gratuitous or accommodation surety and, as such, was relieved of any liability when the terms of the contract for services were materially altered by the change in plaintiff's hourly rate from $150 to $180.

■ A promise to be responsible for the contract of another is a contract of suretyship. *Vermont Marble Co. v. Bayne*, 356 Ill. 127, 190 N.E. 291 (1934); see generally J. Elder, Stearns on Suretyship § 2.1, at 8 (5th ed. 1951) ("[t]he contract of suretyship is created when, to obtain some credit or other advantage for another, the surety engages to be liable for him to another"); 74 Am. Jur. 2d *Suretyship* § 1, at 12 (1974) (suretyship is defined as a "contractual relation resulting from an agreement whereby one person, the surety, engages to be answerable for the debt, default, or miscarriage of another, the principal"). A contract is one of suretyship when one obligates himself to pay the obligee, absolutely and wholly, without the necessity that the obligee exhaust his remedies against the principal before proceeding against the surety. *Vermont Marble Co. v. Bayne*, 356 Ill. 127, 190 N.E. 291.

Whether a party assumes the status of a principal debtor or surety depends upon the intention of the parties as evidenced from the language of the instrument signed and the circumstances attending its execution. *Vermont Marble Co. v. Bayne*, 356 Ill. 127, 190 N.E. 291. The undertaking of a surety is strictly construed and may not be extended by implication or imposed beyond the express terms of the

instrument. *Wright v. Loring*, 351 Ill. 584, 184 N.E. 865 (1933); *Gilbert v. Estate of Yunk*, 214 Ill. 237, 73 N.E. 335 (1905). *Cf.* J. Elder, Stearns on Suretyship § 2.4, at 11-12 (5th ed. 1951) (under modern view rule, the legal doctrine of *strictissimi juris* applies to accommodation or uncompensated surety but not to paid surety). Where the express terms of the instrument are ambiguous, the parties' intentions can be determined from their declarations and conduct and from the surrounding circumstances. *Claude Southern Corp. v. Henry's Drive-In, Inc.*, 51 Ill. App. 2d 289, 201 N.E.2d 127 (1964); see *Aurora Firefighter's Credit Union v. Harvey*, 163 Ill. App. 3d 915, 516 N.E.2d 1028 (1987) (if intent is not expressed, the purpose for which the instrument was executed or used is significant). See generally J. Elder, Stearns on Suretyship § 2.5, at 15 (5th ed. 1951).

As will be discussed below, the plaintiff presented very little evidence on the issue of whether McClandon was a principal debtor or surety. The only evidence presented by the plaintiff on that issue was the contract, the plaintiff's engagement letter dated May 25, 1990. In that letter, the plaintiff acknowledged McClandon's "request that [he] represent Maxwell Manor" and indicated that his services would be billed at the hourly rate of $150. The plaintiff also suggested that McClandon have her "personal attorney" review the letter before countersigning it. With respect to liability for payment, that letter stated:

> "The persons responsible for the fees and other charges include not only the legal entity that operates the home, but every individual holding an interest of twenty percent or more, directly or through other individuals and entities, in the operator or the underlying real estate, or both."

The letter was signed by the plaintiff and provided for countersignatures. Above the lines for countersignature appeared the following language:

> "The undersigned owners of the nursing home known as Maxwell Manor *** have read and do agree to the terms of the foregoing letter, including the terms of our individual responsibility for fees and charges incurred in connection with legal services to it."

Defendant McClandon signed her name on the first countersignature line.

It is manifest from the face of the May 25, 1990, letter that McClandon, in countersigning that letter, agreed to be liable for the services provided on behalf of Maxwell Manor. Neither the express language of the letter nor the language preceding her signature specifies the manner in which McClandon or the "persons responsible for fees" would become liable for those fees, that is, whether those

individuals would be primarily liable as principals and co-debtors or as sureties. This inartfully drawn letter also did not seek separate signatures from McClandon, one on behalf of Maxwell Manor as its executive director, and a second by McClandon in her personal capacity. Ambiguity is further apparent from the fact that, although McClandon signed the letter as an "owner[ ] of the nursing home known as Maxwell Manor," she was not Maxwell Manor's owner.

Plaintiff's failure to establish the nature of McClandon's liability continued at trial when he presented no evidence on this issue. The plaintiff did not testify nor did he question McClandon concerning any discussions they may have had on the issue of McClandon's liability. No evidence was presented to show that McClandon had any direct ownership interest in Maxwell Manor as a shareholder of that corporation or the extent of the salary, if any, she received as Maxwell Manor's executive director. The plaintiff did not call McClandon as a witness although, as discussed above, McClandon did testify, pursuant to questioning by her attorney, that Maxwell Manor was a not-for-profit corporation. She also testified that she was not an officer or director of that corporation but was a partner in the partnership that was Maxwell Manor's lessor.

■ In the context of suretyship law, a principal is the person who is primarily liable and for whose performance of his obligation the surety has become bound. Black's Law Dictionary 1193 (6th ed. 1990); see generally Restatement of Security § 82, Comment *a*, at 229 (1941). The surety's obligation, wherein he agrees to be answerable for the debt or obligation of another, is not an original and direct obligation for the performance of his own act, but rather is an accessorial obligation to the obligation contracted by the principal. 74 Am. Jur. 2d *Suretyship* § 1, at 12 (1974); see L. Simpson, Suretyship § 2, at 4 (1950). While both the surety and the principal may be primarily liable to the creditor or obligee, they are distinct entities in that:

> "The principal is the one who enters into the main contract with the obligee or creditor and who is directly interested in and benefited thereby. He, and not the surety, is the one to whom or from whom the consideration for the main obligation flows, and therefore one who receives and retains the consideration or benefit of a contract cannot occupy the position of a surety." 74 Am. Jur. 2d *Suretyship* § 3, at 13 (1974).

■ Case law interpreting the Uniform Commercial Code (UCC) and distinguishing a primary debtor or maker from an "accommodation party," which is in the nature of a surety (*Palmetto Leasing Co. v. Chiles*, 235 Ill. App. 3d 986, 602 N.E.2d 77 (1992); see *Agribank, FCB v. Whitlock*, 251 Ill. App. 3d 299, 621 N.E.2d 967 (1993) (an ac-

commodation maker is a surety and can avail himself of the surety defenses)), is persuasive to our determination as to whether McClandon was a principal debtor or surety. See *Aurora Firefighter's Credit Union v. Harvey*, 163 Ill. App. 3d 915, 516 N.E.2d 1028 (applying UCC principles to determine "primary obligor" under Truth in Lending Act (15 U.S.C.A. § 1601 *et seq.* (West 1982)). In those cases, the courts were inclined to recognize a party as an accommodation party or surety rather than as a co-maker or principal when that party received no direct benefit from execution of the note. *E.g., Aurora Firefighter's Credit Union v. Harvey*, 163 Ill. App. 3d 915, 516 N.E.2d 1028; *Godfrey State Bank v. Mundy*, 90 Ill. App. 3d 142, 412 N.E.2d 1131 (1980). A party was considered to be an accommodation party when (1) the party did not participate in negotiations for credit or subsequent modifications of credit arrangements, (2) the evidence showed that the creditor was aware that the party was not the one seeking the credit, (3) the party was not the one to whom proceeds were credited, and (4) the party had no interest in the purpose for which the proceeds were used. *Agribank, FCB v. Whitlock*, 251 Ill. App. 3d 299, 621 N.E.2d 967; see *Commercial Mortgage & Finance Co. v. American National Bank & Trust Co.*, 253 Ill. App. 3d 697, 624 N.E.2d 933 (1993); *Wohlhuter v. St. Charles Lumber & Fuel Co.*, 25 Ill. App. 3d 812, 323 N.E.2d 134 (1975). In the absence of specific language in the instrument to the contrary, an individual who co-signed a note with a corporate entity was considered to be an accommodation maker and not a principal debtor or co-maker when he received only indirect benefits such as employment compensation or shareholder dividends from the corporation. *Commercial Mortgage & Finance Co. v. American National Bank & Trust Co.*, 253 Ill. App. 3d at 702-03, 624 N.E.2d at 937, quoting 810 ILCS Ann. 5/3—419, Uniform Commercial Code Comment 1, at 269 (Smith-Hurd 1993), stating:

" '[I]f X cosigns a note of Corporation that is given for a loan to Corporation, X is an accommodation party if no part of the loan was paid to X or for X's direct benefit. This is true even though X may receive indirect benefit from the loan because X is employed by Corporation or is a stockholder of Corporation, *or even if X is the sole stockholder so long as Corporation and X are recognized as separate entities.*' " (Emphasis added.)

◼ The trial court in the case at bar found McClandon to be a principal debtor on the contract with the plaintiff. However, we do not believe that the record before us supports that conclusion. See *Commercial Mortgage & Finance Co. v. American National Bank & Trust Co.*, 253 Ill. App. 3d 697, 624 N.E.2d 933 (finding that defen-

dant was a principal was against the manifest weight of the evidence where record is devoid of facts to support that conclusion). As noted above, the document that McClandon signed, the May 25, 1990, letter, which was drafted by the plaintiff, did not designate McClandon as a principal debtor or use any language that would suggest principal liability. Moreover, no evidence was presented to support a finding that the parties intended for McClandon to be a principal debtor nor can such intent be implied from the facts surrounding the contract's execution. So, too, there was no evidence that McClandon received any direct benefit from the contract between Maxwell Manor and the plaintiff so as to make her a principal on that contract. The May 25, 1990, agreement provided that the plaintiff was to represent Maxwell Manor, and Maxwell Manor received the direct benefit of the agreement. Any benefit received by McClandon would have been indirect insofar as she may have received a salary as an employee of Maxwell Manor and insofar as she may have received rental income as a partner in the partnership that was Maxwell Manor's lessor. See 810 ILCS Ann. 5/3—419, Uniform Commercial Code Comment 1, at 269 (Smith-Hurd 1993); *Commercial Mortgage & Finance Co. v. American National Bank & Trust Co.*, 253 Ill. App. 3d 697, 624 N.E.2d 933.

We also note along those lines that the plaintiff was aware that he was not acting as McClandon's personal attorney and was only representing Maxwell Manor since he suggested in the May 25, 1990, letter that McClandon have her "personal attorney" review the letter before she countersigned it. See *Agribank, FCB v. Whitlock*, 251 Ill. App. 3d 299, 621 N.E.2d 967 (plaintiff bank knew defendants were not seeking credit; loan proceeds sought by defendants' son); *Holcomb State Bank v. Adamson*, 107 Ill. App. 3d 908, 438 N.E.2d 635 (1982) (plaintiff bank knew proceeds of note were for defendant's son-in-law). Absent any proof of principal liability by McClandon and absent any proof of direct benefit to her, it cannot be concluded that by signing the May 25, 1990, letter McClandon became a principal debtor. All that can be concluded from McClandon's individual signature is that she agreed to be "responsible" for Maxwell Manor's debt as a prerequisite for plaintiff's agreement to represent Maxwell Manor. Her agreement to be answerable for Maxwell Manor's debt personally obligated her to the plaintiff as a surety rather than as a principal and co-debtor with Maxwell Manor. See *Vermont Marble Co. v. Bayne*, 356 Ill. 127, 190 N.E. 291; see also J. Elder, Stearns on Suretyship § 2.1, at 8 (5th ed. 1951) ("[t]he contract of suretyship is created when, to obtain some credit or other advantage for another, the surety engages to be liable for him to another"); 74 Am. Jur. 2d *Suretyship* § 1, at 12 (1974).

■ McClandon next argues that she was a voluntary or gratuitous surety and as such her obligation was discharged when the terms of the contract changed, that is, when the plaintiff's hourly rate was increased from $150 to $180. A voluntary or accommodation surety, that is, one who has not received consideration for his promise (see *South Side Bank & Trust Co. v. Yorke*, 15 Ill. App. 3d 948, 305 N.E.2d 367 (1973)), is discharged if there is any change made in the contract without his consent. *Grundy County National Bank v. Cavanaugh*, 105 Ill. App. 3d 718, 434 N.E.2d 803 (1982) (any agreement between a creditor and principal which essentially varies the terms of the contract without the consent of the surety will release the surety of liability); *Watkins Products, Inc. v. Walter*, 11 Ill. App. 3d 417, 296 N.E.2d 859 (1973) (a gratuitous surety will be released when his risk is increased); *Mathes v. Stewart*, 249 Ill. App. 558 (1928). See generally Restatement of Security § 128(a), at 340 (1941); J. Elder, Stearns on Suretyship § 6.2, at 107-08 (5th ed. 1951). A compensated surety, that is, one who becomes a surety for pecuniary profit (J. Elder, Stearns on Suretyship § 5.1, at 89 (5th ed. 1951)), is not discharged when the contract has been modified without his consent unless there is a material departure from the contract which results in some injury to the surety. *Fisher v. Fidelity & Deposit Co.*, 125 Ill. App. 3d 632, 466 N.E.2d 332 (1984); *Mathes v. Stewart*, 249 Ill. App. 558. See generally Restatement of Security § 128(b), at 341 (1941); J. Elder, Stearns on Suretyship § 5.5, at 94-95 (5th ed. 1951).

■ Generally, compensated sureties are incorporated and "organized for the purpose of assuming classified risks in large numbers, for pecuniary profit, and on an impersonal basis." J. Elder, Stearns on Suretyship § 5.1, at 89 (5th ed. 1951). In the Restatement of Security, a compensated surety is defined as a corporate surety that engages in the business of executing surety contracts for compensation called a premium. Restatement of Security § 82, Comment *i*, at 233-34 (1941). The Restatement states:

"Other sureties, whether strictly gratuitous or whether receiving some pecuniary advantage, whose surety contracts are occasional and incidental to other business, are not included among compensated sureties.

It is important to distinguish between compensated and other sureties because the rules of suretyship, notably those relating to the defenses of the surety, are not in all respects alike for the two classes. The basis for the distinction is that one engaged in the business of executing surety contracts can be expected to have contemplated and taken account of, in the premium charged, certain elements of risk which are not considered to have been as-

sumed by other sureties." Restatement of Security § 82, Comment *i*, at 234 (1941).

Because it is the business of corporate sureties to take risks and expect losses, they cannot avail themselves of the rule of *strictissimi juris* or escape liability whenever there has been a departure from the contract. *Atlantic Trust & Deposit Co. v. Town of Laurinburg*, 163 F. 690 (4th Cir. 1908). See *Gunsul v. American Surety Co.*, 308 Ill. 312, 139 N.E. 620 (1923) (rule of strict construction not applicable to surety company acting for compensation). See generally J. Elder, Stearns on Suretyship § 5.1, at 90-91 (5th ed. 1951).

■ The defendant acknowledges that McClandon was not a corporate surety but contends that she should be treated as a compensated surety because she received consideration for her promise in the form of rental payments from Maxwell Manor. In support of his argument, the plaintiff relies on *Mathes v. Stewart*. In that case, the court recognized the distinction between voluntary sureties and surety companies. Although the surety in that case was not a surety company, the court nevertheless refused to treat the surety, a lumber company, as an accommodation surety since the surety received consideration for its execution of the bond. In exchange for the lumber company's agreement to act as Stewart's surety, Stewart agreed to purchase from it the lumber necessary to carry out the construction contract between Stewart and Mathes. Finding that the lumber company executed the bond for consideration, the lumber purchase, the court applied the discharge rules applicable to surety companies and refused to discharge the lumber company because the departures from the contract did not result in injury to the lumber company/surety.

Based on the record before us, the plaintiff has not established that McClandon was anything other than a gratuitous surety. Here, as in *Mathes*, the surety was not a surety company doing a surety business for profit. However, unlike in *Mathes*, there was no evidence presented to show that the surety received any consideration for the suretyship promise. In reaching this conclusion, we reject plaintiff's argument that McClandon received consideration from Maxwell Manor in the form of Maxwell Manor's rental payments. First, we note that the rental payments were made to the BMJ partnership, not to McClandon individually. Second, and more persuasive, is the fact that there was no evidence to show that McClandon made her execution of the surety agreement contingent upon Maxwell Manor's execution of the lease. In fact, the lease between Maxwell Manor and BMJ was executed prior to McClandon's agreement to act as Maxwell Manor's surety. Since the lease agreement was not tied, in any way,

to Maxwell Manor's contract with the plaintiff, it could not act as the *quid pro quo* found to be present in *Mathes*. Thus, since the plaintiff did not establish that McClandon received consideration or was anything other than an individual surety, whose surety contract was "occasional and incidental to other business" (Restatement of Security § 82, Comment *i*, at 234 (1941)), she was a voluntary surety and was entitled to the protections afforded to that class of sureties. See Restatement of Security § 82 (1941).

As discussed above, as a voluntary or gratuitous surety, McClandon would be discharged of her surety obligations upon proof that the contract between the plaintiff and Maxwell Manor was changed without her consent. *Grundy County National Bank v. Cavanaugh*, 105 Ill. App. 3d 718, 434 N.E.2d 803; *Watkins Products, Inc. v. Walter*, 11 Ill. App. 3d 417, 296 N.E.2d 859. It is undisputed that the contract was modified in 1991, in that plaintiff's hourly rate was increased from $150 to $180. It also is undisputed, as the plaintiff conceded in his closing argument, that the plaintiff presented no evidence about the 1991 agreement. As a result, the plaintiff did not prove consent by McClandon to the contract modification to increase plaintiff's hourly rate, and, therefore, McClandon was discharged of her surety obligations and, thus, was not liable for the plaintiff's legal fees.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed as to defendant Maxwell Manor but reversed as to defendant JoeAnn McClandon.

Affirmed in part; reversed in part.

COUSINS and HOURIHANE,[3] JJ., concur.

---

[3]Justice T. O'Brien originally sat on the panel in this appeal. Upon Justice O'Brien's retirement, Justice Hourihane substituted in the decision of this appeal. He has read the briefs and listened to the tape of oral argument.