**In re KIDS CREEK PARTNERS, L.P., Debtor.**

**Bankruptcy No. 94 B 23947.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

April 23, 1997.

Steve Shamash, David Belofsky & Associates, Chicago, IL, for Trustee.

Janet S. Baer, Schwartz, Cooper, Greenberger & Krauss, Chicago, IL, for Leighton Holdings, Inc.

*MEMORANDUM OPINION ON MOTION TO RECONSIDER COURT'S ORDER AND FINDINGS OF FACT AND CONCLUSIONS OF LAW*

JACK B. SCHMETTERER, Bankruptcy Judge.

The present dispute relates to the bankruptcy proceedings as to Debtor Kids Creek Partners, L.P. ("Debtor") under Chapter 7 of the Bankruptcy Code, Title 11 U.S.C. Counsel for the Chapter 7 Trustee is David A. Belofsky & Associates. His counsel ("Applicant") filed Application for Professional Compensation ("Application") and a creditor, Leighton Holdings, Ltd. ("Leighton"), objected thereto. The professional services were for pursuing an Adversary proceeding filed by the Trustee against Leighton.

Leighton objected to the requested fees and expenses partly on grounds that the services were not reasonable, valuable, or necessary to administration of the bankruptcy estate or beneficial to it. Such objections to the fee petition were treated as a contested matter under Fed. R. Bankr.P. 9014.

In addition, Leighton objected to payment of the requested fees and expenses in any amount, asserting that it is a secured creditor and any payment to Applicant would be from Leighton's cash collateral for which it would not be adequately protected. Applicant and the Trustee dispute Leighton's secured status. Under Fed. R. Bankr.P. 7001(2), actions to determine the validity, priority or extent of a lien are ordinarily brought as adversary proceedings. However, both parties involved here through their respective counsel expressly waived the need to file an adversary proceeding to determine the validity or extent of Leighton's lien and agreed to deal with all issues as a contested matter under Fed. R. Bankr.P. 9014.

The Application was set for trial on November 4, 1996, and evidence was taken. The parties rested. Following that hearing, an order was entered November 6, 1996, intended to be supported by subsequent entry of Findings of Fact and Conclusions of Law. That order ruled that Leighton is a secured creditor. It also allowed compensation to Applicant in the amount of $53,670.00, and allowed and authorized reimbursement of costs in the amount of $3,180.65. However, only the payment of $25,000.00 was authorized toward the allowed compensation, doubt being expressed from the bench as to adequacy of protection to Leighton's secured interest should any further payment be ordered. Before the Findings of Fact and Conclusions of Law could be prepared, however, the Trustee moved "to reconsider" the November 6 order, a motion treated here as one to alter or amend a portion of the November 6 order.[1]

---

1. A motion to alter or amend judgment lies under Fed.R.Civ.P. 59(e), and a motion for relief from judgment is made under Fed.R.Civ.P. 60(b). A motion to alter or amend judgment must be filed no later than 10 days after entry of the judgment. Where such a motion is filed outside the 10-day period, it is considered a motion for relief from judgment under Fed.R.Civ.P. 60(b) (applicable in bankruptcy proceedings by virtue of Fed R. Bankr.P. 9024). *See Kunik v. Racine County, Wis.*, 106 F.3d 168, 173 (7th Cir.1997).

Fed. R. Bankr.P. 9006(a) provides, in computing such time periods, that the initial date upon which the time period begins to run is not to be counted. While the last day of the time period is counted, when the last day of the time period falls on a weekend or other specified day, the time period runs until the end of the next day. As the tenth day of the period involved here fell on Saturday, November 16, 1996, pursuant to Fed. R. Bankr.P. 9006(a) and Fed.R.Civ.P. 59(e) and 60(b), the instant motion is considered a motion to alter or amend judgment under Fed. R.Civ.P. 59(e) made applicable herein pursuant to Fed. R. Bankr.P. 9023.

Based on pleadings, testimony, and evidence offered at the hearing, and argument of the parties, including briefs on the instant Motion, the following Findings of Fact and Conclusions of Law are made and entered. Pursuant thereto, and the Order of November 6 supporting Leighton's claim of secured interest being now viewed as legally flawed, the Movant's motion to alter that Order will be allowed. The order for fees will be amended to provide for immediate and complete payment of the balance of fees allowed because Leighton is found to be unsecured. Further, separate judgment will be entered declaring that Leighton has no secured interest in funds held by the Trustee.

### FINDINGS OF FACT

1. The Debtor, Kids Creek Partners, L.P., was in the business of attempting to develop or redevelop an approximately 450 acre parcel of real estate in Traverse City, Michigan, known as the "Commons."

2. Beginning in January, 1993, Leighton and Debtor entered into various loan and security agreements. Pursuant to these agreements, Leighton advanced the aggregate principal amount of $1,692,740 to the Debtor. In January 1994, Leighton ceased funding the loans, alleging Unmatured Events of Defaults and Events of Default had occurred under the loan documents.

3. On December 14, 1993, pursuant to the parties' agreements, Debtor provided Leighton with a mortgage ("Leighton Mortgage") on Debtor's interests in the Commons real estate (the "Property"). The Leighton Mortgage was recorded December 14, 1993. The Leighton Mortgage was secured by the Commons real estate, leasehold interests, rents, profits, and revenues derived directly or indirectly from the real estate, and certain personal property and equipment. The mortgage provided that the mortgage would be released upon payment of the entire indebtedness and strict performance of the other terms and conditions of the mortgage.

4. On December 5, 1994, an involuntary petition was filed under Chapter 7 of the Bankruptcy Code. An Order for Relief was entered on December 30, 1994.

5. Also on December 30, 1994, an Order ("Subject Order") was entered authorizing the Chapter 7 Trustee, David R. Herzog, to sell Debtor's interests in the Commons for approximately $2.8 million.

6. The Subject Order provided, among other things, that

the sale of the real property to Munson and the County as set forth in Exhibit A and the quitclaim of the real property to the Commons as in Exhibit B shall be free and clear of all liens and other encumbrances and to the extent that such liens and encumbrances exist, they shall attach to the proceeds of sale of the real property set forth in Exhibit A in the same validity and priority as they had in the real estate, subject to further Order of this Court. Said liens and encumbrances include, but are not limited to, the following:

1. Mortgage in favor of Leighton Holdings, Ltd., recorded in Liber 938, page 838, of Grand Traverse County, Michigan, records.

7. Pursuant to the Subject Order, the Trustee was to pay in full the secured claim of Leighton. Neal L. Wolf, counsel for Leighton, handwrote the following section of that Order as entered which provided, in relevant part:

[A] It is further ordered that, upon closing of the transaction authorized by this order, secured creditor Leighton Holdings, Ltd. will immediately be paid the full principal amount of its claim, all accrued and unpaid interest, all attorneys fees, and all costs which it has incurred as of the date of closing. Such payment will be without prejudice to any claims of any party as of the date of the payment. As of the time of such payment, the secured creditor ("SC") will obtain a letter of credit issued by a bank reasonably acceptable to the Trustee in favor of the Trustee in the amount of $1.25 million to expire in 45 days. If, within 45 days after issuance of said letter of credit, the Trustee does not initiate a lawsuit against SC, SC will have an allowed super priority administrative claim against the estate, prior to the claim otherwise allowable under section 507(a) of the Bankruptcy Code, in the amount of SC's

letter of credit fees, additional attorneys fees, and costs. The Trustee's failure to initiate such a lawsuit against the SC within such 45–day period shall constitute a waiver and release of any and all claims the estate might have against the SC, Lakeside Partners, and Cecil McNab, arising out of the secured loan transactions which are the subject of the SC's claim. [B] If the Trustee files a lawsuit against SC within such 45–day period, the letter of credit will be extended or renewed as necessary to secure the Trustee's asserted claim until such claim is resolved (or, if the letter of credit is not so extended or renewed then the Trustee may draw on the letter of credit, retain the proceeds of such drawing in escrow, and apply the proceeds as determined by such lawsuit or an agreement of the parties). In the latter event, SC shall have a first priority lien against such letter of credit proceeds in the amount ultimately determined to be appropriate.

[C] If the Trustee initiates such a lawsuit and the SC prevails, then the SC shall have an allowed super-priority administrative claim, prior to the claim of any holder of a claim otherwise allowable under Section 507(a) of the Bankruptcy Code, for (a) all costs and fees associated with the issuance of the letter of credit; (b) all legal fees and expenses incurred in defense of the lawsuit; (c) all other fees and expenses reasonably incurred in connection with the collection of SC's claim; and (d) any and all funds previously drawn by the Trustee under the letter of credit, together with interest at the SC's contractual, default rate.

8. On December 30, 1994, the Court engaged counsel in a discussion before the bench about the effect of the Subject Order. At that time, counsel for both Debtor and Leighton stated that their understanding of the transactions was that Leighton would be paid in full but was required to obtain the $1.25 million letter of credit. The effect of this, as represented by both parties, was to relieve the funds to be obtained from the sale from the lien as the secured lien would be paid in full.

9. The Trustee thereafter completed the sale authorized by the Subject Order and received the proceeds of sale in his capacity as Chapter 7 Trustee.

10. On January 18, 1995, counsel for Leighton sent counsel for the Trustee a letter with wire-transfer directions for transfer to Leighton from sale proceeds of $2,098,-496.41, the amount Leighton considered "necessary to satisfy all obligations to Leighton Holdings, Ltd. through January 3, 1995." The Trustee wire-transferred the funds as directed on or about January 19, 1995. Winston & Strawn (as Leighton's counsel at that time) received $29,983.62, and Leighton received $2,068,512.79.

11. Leighton thereby received payment of the full amount that it loaned to Debtor plus all accrued interest and attorney fees due as of the time of such payment.

12. About that time, Leighton furnished the $1.25 million letter of credit and permitted recording of its Discharge of Mortgage and Security Interests ("Mortgage Discharge") previously dated November 30, 1994. The Mortgage Discharge was written by Leighton's attorney, Andrew Connor. It provided, among other things:

... Payee has released and discharged and by these presents hereby remises, releases, conveys and quitclaims all of Payee's right, title, interest, claim, or demand whatsoever in and to the Property, and discharges the Property from all liens, mortgages, assignments, security interests, and superior title created by and existing under the Mortgage in and to the Property and from all other liens, mortgages, assignments, security interests, and superior title of whatever nature held by Payee in and to the Property as security for payment of the Notes and/or the performance of the obligations under the Mortgage.

13. On February 15, 1995, within the 45–day period specified in the Subject Order, the Trustee filed an Adversary Complaint against Leighton and others, including Cecil McNab, seeking equitable subordination of Leighton's claims, recharacterization of Leighton's "loans" as contributions of equity, breach of contract, and other relief.

14. On August 21, 1995, the Trustee was granted leave to employ Applicant as Special Counsel for the purpose of representing the Trustee in the related Adversary Proceeding.

15. On September 26, 1996, motions for summary judgment filed by Leighton, McNab, and co-defendant Rafael Rios in the related Adversary proceeding were denied.

16. The instant Application by Trustee's attorneys seeks interim compensation for professional services provided to the Trustee in connection with the Adversary during the period August 21, 1995 through June 1, 1996, in the amount of $53,670.00 for fees based on an hourly rate of $150.00, and $3,180.65 for reimbursement of costs.

17. Leighton, in its Objection, does not dispute the hours expended or tasks prepared by attorneys for the Trustee, but it attacks the reasonableness and necessity of the fees incurred. In this regard, Leighton first contends that the Adversary proceeding is wholly frivolous and without merit, and therefore no fees or expenses incurred in connection with the Adversary can be reasonable or necessary. That argument has no merit in light of the denial of summary judgment and the subsequent order setting the Adversary for trial.

18. If the Trustee prevails in the Adversary Proceeding, the benefit to the Estate would be between $1.25 and $2.1 million.

19. Leighton also objects to the Application on the ground that it asserts a lien on all estate funds to secure repayment of Leighton's attorneys' fees and expenses incurred in defense of the Adversary Proceeding as the Subject Order allows it to claim if it prevails in the Adversary proceeding. It contends that Applicant impermissibly seeks payment from Leighton's "cash collateral" without its consent and without provision of adequate protection to its secured interest in cash held by that estate.

20. Counsel for Leighton contend that they have devoted nearly $400,000.00 of attorneys' time in defending the Adversary Proceeding. Leighton admits that this figure includes work performed on behalf of Cecil McNab as well as work performed in connection with general administrative issues in the bankruptcy case.

21. Leighton has not filed a proof of claim asserting an unsecured claim against the estate.

22. To date, the only funds ever deposited into Debtor's estate (exclusive of interest accruing on deposited funds) were the aforesaid sale proceeds.

23. At the time of the hearing on November 4, 1996, the estate held at least $325,000 in cash.

24. Although Fed. R. Bank. P. 7001(2) requires that an action to determine the validity, extent, and priority of liens is to be adjudicated through an adversary proceeding, the parties involved here through counsel stipulated to a waiver of that procedure, and agreed instead to have the matter resolved as a contested matter under Fed. R. Bank. P. 9014. Tr. Nov. 4, 1996, pp. 15–16. Issues concerning fees are a contested matter treated under Fed. R. Bankr.P. 9014.

25. Factual matters set forth in the conclusions of law will stand as additional Findings of Fact. Any legal conclusions contained herein will stand as additional Conclusions of Law.

## CONCLUSIONS OF LAW

### Jurisdiction

This matter is properly before this Court pursuant to 28 U.S.C. § 157 and Local General Rule 2.33(A) of the Northern District of Illinois. Subject matter jurisdiction lies under 28 U.S.C. § 1334(b). Venue lies properly under 28 U.S.C. § 1409. This matter constitutes a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), and (K).

### Standards for Motion Alter Judgment

A motion to alter or amend judgment under Fed.R.Civ.P. 59(e) is ordinarily granted only where there is some newly discovered material evidence or a manifest error of law or fact: *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir.1996). "The rule essentially enables a district court to correct its own errors, sparing the parties and the appellate courts the burden of unnecessary appellate

proceedings." *Russell v. Delco Remy Div. of General Motors Corp.*, 51 F.3d 746, 749 (7th Cir.1995). However, a party may not use the rule to correct its own procedural failures, relitigate old matters or advance arguments that could or should have been presented prior to judgment. *Moro*, 91 F.3d at 876 (citing *LB Credit Corp. v. Resolution Trust Corp.*, 49 F.3d 1263, 1267 (7th Cir.1995)).

Although Leighton argues that applicant is attempting to relitigate issues previously argued and attempting to present a new argument to previously offered facts, it is mistaken. Movants argue and have for reasons stated below demonstrated that an error of law was made as part of the initial ruling when it was found that Leighton continued to hold a post-petition security interest in proceeds from sale of the Property.

### *Discussion*

Section 330 of the Bankruptcy Code provides for "reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by any such person; and reimbursement for actual and necessary expenses." 11 U.S.C. § 330(a)(1). Leighton argues that Applicant's services were not reasonable, valuable, or necessary to the bankruptcy estate because the Adversary itself is frivolous. It does not dispute the appropriateness of individual services or reasonableness of fees apart from attacking the whole suit against it.

However, Applicant did provide reasonable, valuable and necessary services to the Estate. The Trustee's Adversary Proceeding is not frivolous, as was made clear by denial of Leighton's motion for summary judgment. Indeed, if the Trustee is successful, the estate will receive a benefit of more than $1.25 million.

Applicant has also established by documentation that services for which compensation is sought were necessary and beneficial to the estate through prosecution of the Adversary Complaint. The amount sought is reasonable, particularly in light of complexity of the litigation and the results thus far obtained in defending against a motion for summary judgment. Considering the factors to be weighed under 11 U.S.C. § 330(a) when professional fees are sought, the Application here was well founded.

Applicant's fees were therefore fully allowed by the November 6 Order. However, it was stated from the bench that the fees could not be paid in full at that time because of the ruling that Leighton held a post-petition security interest in the Estate's cash, and payment therefrom would leave Leighton without adequate protection.

The mortgage in favor of Leighton was found to have been fully discharged from the Property. All right, title, and interest in the Property whether from the mortgage or any other source was discharged. The proceeds from sale of the Property were used to pay off the debt to Leighton and the balance of the proceeds was free and discharged from the mortgage. However, a U.C.C. security interest document in favor of Leighton, recorded pre-bankruptcy, covered cash from any source. Leighton has asserted a secured claim under the U.C.C. agreement, not under the mortgage, against monies in the estate that came from sale of the Property. Leighton's mortgage balance due at the time of sale was paid in full from sale proceeds, and it discharged its mortgage lien. However, Leighton did not discharge its U.C.C. lien claim, and thus was viewed at the time of the initial ruling as still being secured by the U.C.C. security interest against the net sale cash received during the bankruptcy.

Applicant now focuses on its argument that Bankruptcy Code § 552(a), Title 11 U.S.C., requires a finding that Leighton has no secured claim in the cash currently in the Estate because the Estate does not contain proceeds from any property that Leighton's U.C.C. security interests attached to prior to the bankruptcy order for relief.

Section 552(a) governs the effect of prepetition security interest in post-petition property and applies to all security interests as defined in the bankruptcy code, not only to U.C.C. security interests. HR Rep. No. 595, 95th Cong., 1st Sess. 376–377 (1977). Section 552(a) provides, with an express exception, that property acquired by the debtor

or the estate post-petition is not subject to any lien resulting from a pre-petition security agreement. 11 U.S.C. § 552(a). "As a general rule, if a security agreement is entered into before the commencement of the case, then property that the estate acquires is not subject to the security interest created by a provision in the security agreement extending the security interest to after-acquired property." HR Rep. No. 595, 95th Cong., 1st Sess. 376–377 (1977).

The exception to the rule is codified in § 552(b)(1) which provides (except as provided in certain other sections of the Code, including § 363 dealing with cash collateral) that if the debtor and an entity entered into a pre-petition security agreement, and if the security interest created by that security agreement extends to pre-petition property of the debtor and to proceeds, product, offspring, or profits of such property, then the security interest extends to such proceeds, product, offspring, or profits acquired by the estate post-petition "to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise." 11 U.S.C. § 552(b)(1). This subsection provides an important exception to the general rule of § 552(a), an exception consistent with the Uniform Commercial Code. "If the security agreement extends to proceeds, product, offspring, rents, or profits of the property in question, then the proceeds would continue to be subject to the security interest pursuant to the terms of the security agreement and provisions of applicable law, except to the extent that where the estate acquires the proceeds at the expense of other creditors holding unsecured claims, the expenditure resulted in an improvement in the position of the secured party." HR Rep. No. 595, 95th Cong., 1st Sess. 376–377 (1977). Moreover, " 'proceeds' is not limited to the technical definition of that term in the U.C.C., but covers any property into which property subject to the security interest is converted." *Id.*

■ The general purpose of § 552 is to abrogate "the effect of all pre-petition security interests in subsequently acquired property except those security interests in proceeds to the extent recognized by applicable state law." *In re Lorenz*, 57 B.R. 734, 736 (Bankr. N.D.Ill.1986) (proceeds in question were from property which was not covered by security interest, thus, creditor did not have secured interest in proceeds) (citing *In re Trans–Texas Petroleum Corp.*, 33 B.R. 67, 69 (Bankr.N.D.Tex.1983)).

■ As discussed below, Leighton's U.C.C. rights did not pre-bankruptcy cover future sale proceeds of the post-bankruptcy Property sale, so § 552(a) bars its claim that its U.C.C. rights attached to those proceeds.

■ Leighton's mortgage was a security interest in real estate to secure the repayment of the indebtedness. *Agribank, FCB v. Whitlock*, 251 Ill.App.3d 299, 308, 190 Ill.Dec. 514, 521, 621 N.E.2d 967, 974 (1993), *appeal denied*, 154 Ill.2d 557, 197 Ill.Dec. 483, 631 N.E.2d 705 (1994) (Table), (citing *Petkus v. St. Charles Savings & Loan Association*, 182 Ill.App.3d 327, 330, 131 Ill.Dec. 391, 393, 538 N.E.2d 766, 768 (1989)). Once any mortgagee receives full satisfaction and payment of all sums due under the mortgage, the mortgagee must execute a release of the mortgage. 765 ILCS 905/2 (West 1996). This release extinguishes the lien of the mortgage and bars an action for foreclosure. *Petkus*, 182 Ill.App.3d at 330, 131 Ill.Dec. at 393, 538 N.E.2d at 768 (citing 59 C.J.S. Mortgages § 475(c) (1949)). However, a release of a mortgage lien relinquishes a party's interest in the property specified. It does not affect the party's right to pursue other debts accruing under the contract. *Daiwa Bank, Ltd. v. La Salle Nat. Trust, N.A.*, 229 Ill.App.3d 366, 384, 170 Ill.Dec. 563, 574, 593 N.E.2d 105, 116 (2 Dist.), *appeal denied*, 146 Ill.2d 625, 176 Ill.Dec. 795, 602 N.E.2d 449 (1992) (Table).

■ Thus, when Leighton executed the mortgage release, what it released was its interest in or lien on the Property. The mortgage release written and delivered by Leighton was unequivocal, and it did not reserve or preserve any lien, mortgage, or security interests arising out of the mortgage in Leighton's favor as to any property other than the sale proceeds. Upon full payment

from sale proceeds of all sums then due under the mortgage, the mortgage lien was completely extinguished.

■ The release did not necessarily extinguish Leighton's other rights under its contract. Pursuant to the order of sale, Leighton's lien expressly attached to proceeds of sale. However, Leighton was paid in full from proceeds of sale. As a result, its resulting lien on sale proceeds by virtue of the mortgage was also extinguished. As the precedent cited earlier demonstrates, a secured party's lien and its additional rights under a mortgage agreement are separate and distinct rights. Although such agreement may have provided for attorney fees, these are not secured by the extinguished lien.

Still, when separate obligations exist and the lien has been extinguished, some provision for performance of the remaining obligations may be made. *Daiwa*, 229 Ill.App.3d at 384, 170 Ill.Dec. at 574, 593 N.E.2d at 116. In this situation, payment of Leighton's attorney fees in the event it is victorious in the Adversary has been provided for. The Subject Order specifically provides that if Leighton is successful in defending the Adversary, it will then receive "an allowed superpriority administrative claim against the estate, prior to the claim of any holder of a claim otherwise allowable under section 507(c) of the Bankruptcy Code, in the amount of [Leighton's] letter of credit fees, and additional attorneys fees and costs." However, the Subject Order in no way provided that Leighton's mortgage interest was to survive once its secured claim was paid in full as occurred here, nor did it create any new security interests in Leighton's favor.

Leighton relies on language in the Subject Order that "whatever liens a creditor may have had in the real estate pre-petition, attach to the proceeds generated from the post-petition sale." Leighton's Response to Movant's Motion. That is correct, but hardly helpful. Whatever liens this creditor had in the pre-petition real estate did indeed attach to proceeds generated from the post-petition sale, but only until the mortgage balance was paid and the mortgage was released.

Provisions of the Subject Order which provide for reimbursement of Leighton's attorneys' fees did not expressly or impliedly create any security interests in Leighton's favor. Moreover, Leighton's rights under the Order are subject to a contingency which has not been satisfied. Leighton has not satisfied the expressed contingency that in order to have an allowed superpriority claim, it must "prevail" in the Adversary Proceeding. *See* 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d.* § 2667, pp. 178–180 (under Fed.R.Civ.P. 54(d), providing for award of costs to "prevailing party," a Defendant is considered to have prevailed only when it obtains favorable judgment or case is dismissed). Any claim on Leighton's part arising from the Subject Order has not been allowed and is not presently allowable.

Leighton has also argued that, as the mortgage was not released until after proceeds from the sale were generated, such sale proceeds fell within the § 552(b)(1) exception. However, it gives no authority for this argument. Moreover, the date of the release of mortgage is not the decisive factor. Once Leighton was paid and the mortgage was released, Leighton ceased to have a security interest arising out of the mortgage.

Leighton's primary argument at the hearing was that it holds a secured claim for attorneys' fees and expenses by virtue of the pre-bankruptcy U.C.C. agreement and filing which provided for a lien against cash, among other things. However, cash proceeds in the bankruptcy estate came entirely from sale of the secured real property formerly secured by the mortgage. The U.C.C. security papers covered all types of personal property, cash and intangibles, but did not cover real property.

Leighton also argues now that the U.C.C. provisions granted Leighton a security interest in Debtor's right to purchase the Property. Under this argument, Debtor's right to purchase was said to have been a personal property right of the debtor in which Leighton held a security interest. Leighton argues that cash generated from the sale was a proceed of the personal property right which was secured by the U.C.C. filing, but is unaffected by § 552(a). However, the U.C.C.

provisions which secured the personal property right could not by terms or by law attach to the real property itself. Since Leighton did not hold a security interest in the real property pursuant to the U.C.C. papers, it could not have a security interest in the cash proceeds from the real estate sale. It held a mortgage on the real estate because the U.C.C. interest could not cover real estate or proceeds of the real estate sale. Moreover, the estate received proceeds from sale of the property, not from sale of Debtor's right to purchase.

As stated, § 552(a) provides that property acquired post-petition is not subject to any lien resulting from a pre-petition security agreement. 11 U.S.C. § 552(a). Thus, under § 552(a), the post-petition cash proceeds are not subject to the pre-petition U.C.C. security interest. Section 552(b) does not except Leighton from this provision. The security interest created by the U.C.C. provisions only extended to pre-petition personal property, cash, and intangibles, as well as the post-petition proceeds of such property. It did not extend to the real property which generated cash now in the estate. As the U.C.C. provisions did not and could not give Leighton a security interest in Debtor's real property and no other source was demonstrated to grant the asserted interest in estate cash, Leighton cannot now have a secured interest in proceeds from sale of the Property.

Assuming *arguendo* that Leighton retained a contractual right to recover attorneys' fees and expenses pursuant to its loan agreements made with Debtor, such contractual rights would provide Leighton at best with an unsecured claim against the estate, since it has relinquished its security interests. *Petkus v. St. Charles Savings & Loan Association,* 182 Ill.App.3d 327, 131 Ill.Dec. 391, 393, 538 N.E.2d 766, 768 (1989) (finding that although mortgage lien was extinguished, mortgagee retained contractual right to recover attorneys' fees); *see also* 59 C.J.S. Mortgages § 475, p. 750–751 (although issuance of a mortgage release extinguishes the mortgage lien, and "presumptively" also extinguishes the underlying debt, it is "possible to discharge the lien of the mortgage and put an end to its effect as a security without releasing the debt or precluding an action thereon.")

It presently appears that Leighton's claim for nearly $400,000.00 for attorneys' fees is not entirely supported by its submissions. Its counsel's time records (Joint Exhibit 14) include many entries for services in representing McNab in the Adversary Proceeding, and for general "bankruptcy administration." The Subject Order only provided for attorneys' fees and expenses incurred by Leighton in defense of itself in the Adversary Proceeding. That Order did not provide for recovery of attorneys' fees for McNab's defense of the Adversary Proceeding, or for fees incurred in bankruptcy administration. The old mortgage, to be sure, provided for recovery of all expenditures, expenses and fees as incurred in the

> ... protection of the Collateral and the maintenance of the lien and security interest of this mortgage, including the fees and expenses of any attorney employed by [Leighton] in the any litigation or proceedings affecting this Mortgage, any of the other Loan Documents or the Premises, including probate and bankruptcy proceeding....

Leasehold Mortgage at 37. This additional right to recover such fees and expenses was not discharged by the release of the mortgage. *See Daiwa,* 229 Ill.App.3d at 384, 170 Ill.Dec. at 574, 593 N.E.2d at 116. As Leighton is unsecured and has not yet prevailed in the Adversary Proceeding, the reasonable amount of its fees is not an issue for present decision.

### CONCLUSION

By virtue of the foregoing, Leighton's objection that the estate's funds are its cash collateral, which prevents payment of estate funds to Applicant, is unfounded. Leighton's contention that it has a secured claim on all estate funds is without merit.

Applicant's claim for compensation on behalf of the Trustee will be allowed as an administrative claim against the estate. 11 U.S.C. § 503(b)(2). Such claim is prior to any non-administrative claims against the estate, 11 U.S.C. § 507(a)(1), including the

unsecured claims asserted or that may be asserted by Leighton.

Movants' Motion to Alter or Amend judgment under Fed.R.Civ.P. 59(e) will be granted because Leighton does not hold a security interest in cash proceeds held by the Trustee from sale of the Property.

The Trustee will be authorized by separate order to pay Applicant the balance due on the amount allowed for fees and expenses on November 6, 1996. As the Trustee has already been authorized to pay Applicant $25,000.00 pursuant to the Application as well as the $3,180.65 allowed for expenses, the Trustee will now be authorized to pay Applicant the remaining $28,670.00 in fees without further delay.