April 23, 1999

NO. 4-98-0271

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

COLES-MOULTRIE ELECTRIC COOPERATIVE,    )   Appeal from

an Illinois Not-for-Profit Corporation, )   Circuit Court of

Plaintiff-Appellant,          )   Moultrie County

v.                            )   No. 97CH9

THE CITY OF SULLIVAN, ILLINOIS, an      )

Illinois Municipal Corporation,         )   Honorable

Defendant-Appellee.           )   Dan L. Flannell,

                                        )   Judge Presiding.

_________________________________________________________________

JUSTICE KNECHT delivered the opinion of the court:

Plaintiff, Coles-Moultrie Electric Cooperative (Co­-oper­

ative), ap­peals the dismiss­al of a September 1997 action brought to en­join de­fen­dant, City of Sullivan (Sullivan), from pro­vid­ing electrical ser­vice to specifi­cally de­scribed tracts out­side its cor­porate city limits.  Plain­tiff offered as a bar to the city's attempt to service these areas a June 1992 writ­ten agreement (Agree­ment) that was in­tend­ed to set­tle dis­put­ed ser­vice areas and pro­vide for reim­burse­ment of plaintiff for provid­ing services to areas an­nexed to the city.  In December 1997, the trial court de­nied the injunction, find­ing the Agree­ment to be a waiv­er by plain­tiff of the enti­tle­ment to ser­vice the areas in question within the mean­ing of sec­tion 11-117-1 of the Illi­nois Municipal Code (Ill. Rev. Stat. 1991, ch. 24, par. 11-117-1 now 65 ILCS 5/11-117-1 (West 1996))).  Plain­tiff ap­peals.  We af­firm.

I.  BACKGROUND

The Coop­era­tive is an Illi­nois not-for-prof­it cor­pora­tion en­gaged in the dis­tri­bu­tion of elec­tri­cal energy in and 

around Moultrie County, Illi­nois.  Sullivan is an Illi­nois mu­

nicipal corpo­ration operat­ing an elec­tri­cal genera­tion and dis­

tribution system pursu­ant to the Illi­nois Mu­nici­pal Code.  65 ILCS 5/11-117-1 
et
 
seq
. (West 1996).

On June 29, 1992, the Cooperative and Sullivan en­tered into an agreement de­signed to pro­vide for a reso­lu­tion of ter­rito­rial disputes relat­ing to proper­ty in and near Sullivan.  The Agreement makes certain acknowl­edge­ments about Sullivan's legal right to serve a property re­ferred to as the "Elder Tract or Old Peadro Farm," defines the "exist­ing ser­vice territory" of the respective parties, and pro­vides for the pur­chase of stranded facilities of the Cooperative by Sullivan.

The Agreement, which was attached to plaintiff's com­plaint, in­cludes three attachments.  Appendix A is the legal descrip­tion of the area described as the "Elder Tract or Old Peadro Farm."   Appendix B is a map designating the "existing service territories" of the parties as agreed to in paragraph 3 of the Agreement.  Appendix C is a list of electric facili­ties located on the "Elder Tract or Old Peadro Farm" that were to be ac­quired from the Cooperative by Sullivan pursuant to para­graph 4 of the Agreement.  

The complaint alleges Sullivan notified the Coop­era­tive of its intent to provide electric service to two specifi­cally de­

fined areas, described in counts I and II respectively, which are not lo­cat­ed with­in the cor­po­rate lim­its of Sullivan.  The Coop­

era­tive al­leges the servicing of these areas without prior an­nex­

ation by Sullivan is in direct violation of the terms and con­

ditions of the Agreement.  Plaintiff contends Sullivan by the terms of the Agree­ment is re­quired to annex the disputed prop­

erties 
before
 it can exer­cise its right to pro­vide elec­tric ser­

vice.  Defendant Sullivan argues both of the dis­puted areas are with­in its "ex­isting ser­vice territo­ry" as des­ignated in the Agree­ment and, therefore, do not re­quire an­nex­ation for it to exer­cise its right to service these areas per the terms of the Agree­ment. 

Plaintiff filed its complaint on September 19, 1997, asserting breach of contract by Sullivan with respect to the planned electric service to the two disputed areas and re­quest­ing a per­manent injunc­tion.  On October 27, 1997, Sullivan filed a motion to dis­miss in two counts.  Count I of the motion to dis­

miss was pursu­ant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 1996)) and ar­gued failure to in­

clude cer­tain es­sen­tial par­ties to the cause of action.  Count II ar­gued the Agree­ment was a resolu­tion of a territo­rial dis­pute over service rights that was "clear and unam­bigu­ous," fore­closing plaintiff's cause of action.

In reply to Sullivan's motion to dismiss, the Cooper­ative filed the affidavit of John W. Dooley, who served as admin­

istrative assistant to the gen­eral manager of the Coop­era­tive in 1992 and was instrumen­tal in negotiating the Agreement with Sullivan.  In his affidavit, Dooley pro­vides in­formation as to the Cooperative's pur­pose and intent with re­spect to the Agree­

ment executed with Sullivan.

The trial court denied count I of Sullivan's motion to dismiss for failure to join a necessary party.  With respect to count II of Sullivan's mo­tion to dis­miss, the trial court found the Agreement was "clear and unambiguous" in its terms and in so doing dis­regarded parol evi­dence, in this case the affi­davit of John W. Dooley of­fered by the plain­tiff.  Pursu­ant to this find­

ing, the trial court en­tered a memo­ran­dum order De­cem­ber 17, 1997, dismiss­ing the com­plaint with preju­dice pursu­ant to section 2-619 of the Code.  735 ILCS 5/2-619 (West 1996).  The trial court denied plain­tiff's motion for re­con­sid­era­tion, and plain­

tiff appeals.

II.  ANALYSIS

When faced with a motion to dismiss, the court must accept as true all well-pleaded factual allegations and disregard mere conclusions of law or conclusions of fact unsupported by specific allegations of fact.  
Capitol Indemnity Corp. v. Stewart Smith Intermediaries, Inc.
, 229 Ill. App. 3d 119, 123, 593 N.E.2d 872, 875 (1992); 
Wash­ing­ton v. Chi­cago Board of Education
, 204 Ill. App. 3d 1091, 1094, 562 N.E.2d 541, 543 (1990). 

A.  Contract Interpretation

Plaintiff first con­tends the trial court erred in dis­missing the com­plaint pur­su­ant to sec­tion 2-619 of the Code based on its finding the con­tract at issue was clear, unam­big­uous, and subject to no other reason­able in­ter­preta­tion than that the Agree­ment grants the city the right to provide electric ser­vice to the areas in dis­pute.  Count II of defendant's motion to dis­miss at­

tacked plain­tiff's com­plaint on the grounds the claim as­sert­ed was barred by an affir­mative mat­ter avoiding the legal effect of or defeating the claim.  735 ILCS 5/2-619(a)(9) (West 1996).  The com­plaint sounded in breach of contract.  The issue presented to the trial court was one of contract construction.

The standard of review on appeal from the granting of a motion to dismiss under section 2-619 of the Code is 
de novo
. 
Kedzie & 103rd Currency Exchange, Inc. v. Hodge
, 156 Ill. 2d 112, 116, 619 N.E.2d 732, 735 (1993). Upon review, the appel­late court must eval­uate whether the trial court ruled cor­rectly in finding no genu­ine issue of materi­al fact was raised and whether, as a matter of law, dismissal was proper.  
Kedzie
, 156 Ill. 2d at 116-

17, 619 N.E.2d at 735.

The purpose of involuntary dismissal of actions pur­su­ant to section 2-619(a)(9) of the Code based on an affirmative mat­ter is to pro­vide a mech­anism to dispose of issues of law or easily proved issues of fact at the outset of litigation.  
Meyers v. Rockford Systems, Inc.
, 254 Ill. App. 3d 56, 61, 625 N.E.2d 916, 920 (1993).  Since con­tract construction is a ques­tion of law for the court, an action may be dismissed under section 2-619 of the Code (735 ILCS 5/2-619 (West 1996)) based on the court's in­ter­

pre­ta­tion of the con­tract at issue.  
Corluka v. Bridgford Foods of Illi­nois, Inc.
, 284 Ill. App. 3d 190, 195, 671 N.E.2d 814, 818 (1996).

In this case, plain­tiff con­tends the trial court erred in dis­missing its com­plaint.  Specifi­cally, plaintiff ar­gues the Agree­ment is am­big­u­ous on its face and the trial court failed to consider the Cooperative's interpreta­tion of the con­tract based on the parties' in­tent and past prac­tic­es.  

Plaintiff's contention focuses on the interpreta­tion of the lan­guage in para­graphs 1 through 3 of the Agreement and the boundary map attached thereto.  The rele­vant pro­vi­sions are as fol­lows:

"1. The Cooperative agrees that in exchange for the cove­nants contained herein, that it will not con­

test the right of Sullivan to provide electric service to the property referred to as the Elder Tract or the old Peadro Farm and specif­ically described in Appendix 'A' at­tached hereto.  It is specifically un­derstood and agreed 
when any terri­

tory included in the aforesaid property is annexed
 into the City of Sullivan, that if the customers who reside in the area annexed to the City of Sullivan desire to have electric service from the City of Sullivan that the Cooperative agrees that Sullivan has the legal right to provide such ser­

vice and that the cus­tomers located therein have the legal right to take such service from Sullivan.  

2. Sullivan and the Cooperative agree that as any other property located outside the City limits of Sullivan which be­comes annexed into Sullivan that the City of Sullivan has the legal right to serve that territory once it is annexed into the City of Sullivan and that the customers whose property is annexed into Sullivan have the right to receive elec­tric service from Sullivan.

3. Sullivan and the Cooperative have agreed as to the 
existing service territories
 as of the date of the execution of this Agreement and the map which is at­tached hereto as Appendix 'B' truly and accu­

rate­ly represents said 
existing service areas
.  Sullivan has no objection to the Coop­erative pro­

viding ser­vice to the Hillard prop­erty so long as said proper­ty is not annexed to the City."  (Empha­sis added.)

A boundary map is attached to the Agreement, which shows the bound­ary line be­tween the existing ser­vice territories of Sullivan and the Cooperative.  The legend iden­ti­fies the desig­

nated areas as the respective "ex­ist­ing ser­vice territo­ries."

In interpreting a contract, meaning and effect must be given to every part of the contract including all its terms and provisions, so no part is rendered meaningless or surplusage unless absolutely necessary.  
Martindell v. Lake Shore Na­tional Bank
, 15 Ill. 2d 272, 283, 154 N.E.2d 683, 689 (1958).  A con­tract is to be construed as a whole, giving meaning and effect to every por­tion thereof, if possible, and not resorting to detached por­tions thereof standing alone.  
Home & Automobile Insurance Co. v. Scharli
, 10 Ill. App. 3d 133, 136, 293 N.E.2d 914, 916 (1973).  It is presumed the provisions are pur­posefully in­sert­ed and the language is not employed idly.  
State Farm Mutu­al Automo­bile Insurance Co. v. Schmitt
, 94 Ill. App. 3d 1062, 1065, 419 N.E.2d 601, 603 (1981).

In interpreting the contract language, plaintiff argues the contract language is ambiguous.  Therefore, parol evi­dence should be considered to ascertain the parties' intent with re­spect to the Agreement.  As a gen­er­al rule, when a con­tract pro­vi­sion is unam­bigu­ous, the court must give effect to the plain language of the provision and can­not consider ex­trinsic evidence to deter­mine whether the par­ties have intended another mean­ing.  
Agribank, FCB v. Whitlock
, 251 Ill. App. 3d 299, 309, 621 N.E.2d 967, 974 (1993).  

Plain­tiff em­pha­siz­es the "an­nex­ation" lan­guage in para­graphs 1 through 3.  In short, plain­tiff argu­es it in­tend­ed Sullivan be re­quired to annex before servicing any areas out­side the cor­po­

rate bound­aries, in­cluding those areas within Sullivan's desig­

nated "service terri­tory."  Plaintiff fur­ther argues the multi­ple references to annexation contained in the Agreement were in­tend­ed to impose an annex­ation require­ment upon Sullivan as de­mon­strated by the affi­davit of John W. Dooley, which pro­vides in­for­ma­tion as to the Cooperative's intent and past practices with Sullivan.  De­fen­dant inter­prets the agree­ment oth­er­wise.    

The trial court properly accepted defendant's interpre­ta­tion as the clear and unambiguous meaning of the agreement and dis­re­

gard­ed Dooley's affidavit as parol evi­dence.  De­fen­dant cor­rectly ex­plains the an­nex­ation lan­guage in both para­graphs 1 and 3 ex­

pressly re­quires annexation for specif­ic tracts of prop­erty rath­

er than the en­tire "existing service ter­ritory."  Para­graph 1 discusses an­nexation only with respect to the "Elder Tract or the old Peadro Farm," not the en­tire "ex­isting service territory" of Sullivan.  Like­wise, para­graph 3 plainly references annexation only with re­spect to a specifically de­scribed tract, the "Hillard property."  Therefore, the annexation language of paragraphs 1 and 3 does not support plaintiff's as­ser­tions.

Plaintiff also points to the language of para­graph 2 that refers to annexation to support its claim.  Plain­tiff in­ter­prets this lan­guage to be mandato­ry in requiring annex­ation for any and all proper­ties (other than the tract de­scribed in para­graph 1) for Sullivan to exercise its right to ser­vice these ar­eas.  

A cursory examina­tion of paragraph 2, when read alone, may permit the implication the annex­ation lan­guage could have been in­tended to be mandatory, requir­ing an­nex­ation of all prop­er­ties be­fore Sullivan could service the prop­erties.  This in­ter­preta­

tion, however, renders both para­graph 3 and the map of "ex­isting service terri­to­ries" su­per­flu­ous.  Para­graphs 1, 2, and 3 along with the map cannot be read together and be consis­tent using plaintiff's inter­pretation.  Plain­tiff argues para­graph 2 re­quires Sullivan to first annex property before elec­tri­cal ser­vice is provided, in­clud­ing those properties desig­nated as within Sullivan's "ex­ist­ing ser­vice area."  If we ac­cept plain­tiff's interpretation, es­tab­lishing an "ex­isting ser­vice area" as out­

lined in paragraph 3 or cre­ating the map at­tached to the Agree­

ment would be unnecessary because all prop­er­ties, regard­less of their loca­tion, would be subject to the same an­nex­ation re­quire­

ment. 

In contrast to plaintiff's interpretation, defendant contends paragraph 2 can be given meaning, as well as other parts of the Agreement, as it can be in­ter­pret­ed as an ac­knowl­edge­ment of the state of the law with respect to Sullivan's right to serve newly an­nexed ar­eas.  Short­ly be­fore this Agree­ment was executed, Illinois law was unsettled as to whether a mu­nici­pali­ty could ex­

pand its ex­ist­ing ser­vice area through an­nex­ation.  This ques­tion was re­solved in the af­firma­tive by 
Cen­tral Illi­nois Light Co. v. City of Spring­field
, 161 Ill. App. 3d 364, 367-68, 514 N.E.2d 602, 604 (1987).  In 
Central Illinois Light
, this court held mu­

nic­i­pali­ties have the legal right to serve any area an­nexed to the city.  

Further, defendant's interpretation of paragraph 2 is consistent with paragraph 3, which identifies Sullivan's "ex­ist­

ing service territory."  Para­graph 3 and Appendix B specif­i­cally identify the 
existing
 
service
 
territory
 of Sullivan and the Coop­

erative.  The plain and ordinary meaning of "exist," as de­fined by Black's Law Dictionary, is as follows:  "[T]o be in present force, activity, or ef­fect at a given time, as in speaking of 'existing' contracts, creditors, debts, laws, rights, or liens.  To be or continue to be."  Black's Law Dictionary 574 (6th ed. 1990).  

The plain meaning of the term "exist" dictates that Sullivan possessed, at the time of the exe­cution of the Agree­ment, the right to serve those areas 
with­out
 the need to take fur­ther or later action.  More­over, para­graph 3 does not require that the areas within the "ex­ist­ing ser­vice ter­rito­ry" be an­nexed before Sullivan has the right serve them. 

Based on the foregoing analysis, we find no error in the trial court's de­ter­mi­na­tion the Agree­ment is clear, unam­big­u­ous, and subject to no other rea­son­able inter­preta­tion than grant­ing Sullivan the right to ser­vice, with­out an­nex­ation, the areas in dis­pute in counts I and II as they are locat­ed with­in Sullivan's "existing service terri­to­ry."

B.  Electric Service Outside Corporate Boundaries

Next, plaintiff contends Sullivan does not have a legal right to provide electric service to the areas in dispute that are outside its cor­po­rate limits.  The Illinois Municipal Code (65 ILCS 5/11-117-1 (West 1996)) controls this issue and pro­vides in pertinent part:

   "Subject to the provisions of this Divi­sion 117, any municipality may (1) acquire, con­struct, own and operate 
within the corpo­rate limits of the municipality
 any public utility 
the product or service of which, or a major portion thereof, is or is to be sup­plied to the municipality or its inhabitants
 and may contract for, purchase and sell the product or service of any such utility ***." (Em­phasis added.)

The language of this provision, which grants munici­pal­i­ties the power to own and operate electric utilities, has been consis­tent­

ly in­ter­pret­ed to mean a city has the right to sell elec­tric power out­side its corporate bound­aries so long as the major por­

tion there­of is supplied to the munici­pality or its inhabit­ants.  See generally 
Illinois Power Co. v. City of Jack­son­ville
, 18 Ill. 2d 618, 165 N.E.2d 300 (1960).

Consistent with this interpretation, defendant contends it has the legal right under the Illinois Municipal Code to serve customers both within and outside its corporate limits.  There­

fore, Sullivan has the legal right to serve the parcels at issue even though they are located outside the corpo­rate bound­aries.  In contrast, plaintiff argues mu­nic­ipal­ities do not have the legal right to serve custom­ers be­yond cor­po­rate lim­its.

To understand rights of municipalities as pro­vided in the Illinois Municipal Code (65 ILCS 5/11-117-1 (West 1996)), the his­torical evo­lution and judicial inter­pre­ta­tion of the lan­guage in this provi­sion is significant.  The ini­tial grant of power to mu­nic­i­pal­i­ties to ac­quire, con­struct, own, and operate any public util­i­ty was first con­tained in the Munici­pal Ownership Act of 1913 (Ill. Rev. Stat. 1913, ch. 111a, par. 87), which pro­vided as fol­lows:

"Be it enacted by the People of the State of Illinois, represented in the General Assembly: That any city in this State shall have the power, subject to the provisions of this act, to acquire, construct, own and oper­ate any public utility 
the product or service of which, or a major portion thereof, is or is to be supplied to the city or its inhabit­ants, and to contract for, purchase, and sell to private persons or corporations the prod­uct, or service of such utili­

ties
."  (Emphasis add­ed.)

As stated in 
Jacksonville
, 18 Ill. 2d at 621, 165 N.E.2d at 302:

"In first considering the granted au­thority, this court, in 
Carr v. City of Ath­ens
, 304 Ill. 212, [136 N.E. 633 (1922),] held that the city of Springfield could, by con­tract, sell the product of its public utility beyond its corporate limits.  There­after, in the case of 
People v. City of Chi­cago
, 349 Ill. 304, [182 N.E. 419 (1932),] it was held that a city was not limited in the acquisi­tion of a public utility to one whose physi­cal properties were located wholly with­in the corporate limits of such municipali­ty."

We note 
Carr
 actually held only that the City of Athens could go outside its corporate limits to purchase needed supplies wherever they could be obtained to the best advantage:

"Counsel for appellant also says that the contract of the city of Springfield to furnish electric current to the city of Ath­ens is an illegal contract and cannot be enforced because the Municipal Ownership act, purporting to grant this power to the city of Springfield, is unconstitutional and void.  No provision of the constitution is men­tioned in support of the argument, but the question is not involved and cannot be con­sidered in this case because the city of Springfield is not a party and its right to enter into the contract cannot be determined.  The city of Springfield established an elec­tric power plant at the municipal waterworks stationed on the Sangamon river, north of and outside of the corporate limits of the city, and it is from this plant that an electric current is to be furnished to the city of Athens.  The Springfield Gas and Electric Company, a private corporation engaged in the production and sale of electricity in the city of Springfield, filed its bill for an injunction against the city, charging that the Municipal Ownership act was void because in violation of constitutional rights.  The bill was dis­missed for want of equity and the decree was affirmed by this court.  (
Spring­field Gas and Electric Co. v. City of Spring­field
, 292 Ill. 236 [,126 N.E.739, 18 A.L.R. 929 (1920)].)  The act was there held to be free from con­

stitutional objection so far as it was mate­rial to the issues in that case, but it was said that 
the question whether
 or not 
the city could sell its product outside of the corporate limits was not involved and was not proper to be considered in that case
.  By its contract with the city of Athens the city of Springfield has exerted the power claimed to be given by the Municipal Ownership act to sell electricity outside of the corporate limits, and its right to so dispose of elec­

tricity and to enter into the contract cannot be considered or decided in a case to which it is not a party and cannot be heard in defense of its right.  
The only question which can be considered is whether the city of Athens has power to purchase electricity outside of its corporate limits
 ***.  ***  It is essential to the existence of a local munici­pality that it shall have a cer­tain and de­fined territory in which it may exercise its governmental powers, but whenev­er it is nec­essary, in the exercise of such powers, to go beyond the corporate limits it may do so with or without express authority, as in the case of obtaining water supply for fire pro­tection and the use of its inhabit­ants, pro­curing an outlet for a sewer to promote the public health, or the establish­ment of a pest-

house.  That power has been exercised by the city of Springfield in the establishment of municipal waterworks and an electric power plant out­side of the corporate limits of the city, and the like power has been exercised by very many municipal corpo­rations and the right sustained.  In its business relations a city is not confined, in the purchase of needed supplies, to the lim­its of the city but it may purchase them wherever they can be ob­tained to the best advantage.  Wherever it is found essential to the exercise of corpo­rate powers, a city may go outside of the corpora­

tion to accomplish that result."  (Em­phasis added.)  
Carr
, 304 Ill. at 214-15, 136 N.E. at 633-34.

The lan­guage of the Municipal Ownership Act of 1913, quoted above and referenced in 
Carr
, was later reen­act­ed sub­stan­tial­ly un­changed in 1941 as sec­tion 49-1 of the Revised Cit­ies and Vil­

lag­es Act (Ill. Rev. Stat. 1941, ch. 24, par. 49-1).  

In 1955, the Revised Cities and Villages Act was amend­ed and the phrase "within the corporate limits of the municipali­ty" was inserted and is included in the Illinois Municipal Code in its present form quoted above.  See Ill. Rev. Stat. 1955, ch. 24, par. 49-1 (now 65 ILCS 5/11-117-1 (West 1996)).  The mean­ing of this amend­ment was test­ed shortly there­af­ter in 
Jack­son­ville
, 18 Ill. 2d 618, 165 N.E.2d 300.  

In 
Jacksonville
, the Illinois Power Company contend­ed the insertion of the quoted material in 1955 manifested an intent to repu­diate the holding in 
Carr
 and to restrict mu­nici­pali­ties to the confines of their corporate bound­aries.  
Jack­son­ville
, 18 Ill. 2d at 622, 165 N.E.2d at 303.  The court held such a con­

struc­tion would lead to an absurd re­sult in that a munici­pality would be limit­ed to its bound­aries by one phrase and at the same time "permit­ted to sup­ply persons outside the corpo­rate limits by the balance of the lan­guage."  
Jack­sonville
, 18 Ill. 2d at 622, 165 N.E.2d at 303.  The court fur­ther noted the only legisla­tive limita­tion to the right of munic­ipali­ties to sell outside corpo­

rate bound­aries is that the major portion of the city-owned pub­

lic utility prod­uct be sup­plied to the munici­pality or its inhab­

it­ants.  
Jack­sonville
, 18 Ill. 2d at 623, 165 N.E.2d at 303.

In reaching its decision, the court in 
Jack­sonville
 acknowledged the fundamental rule of statu­to­ry con­struc­tion that the court presumes the legis­la­ture knows of prior interpre­ta­tions of statutory language pur­su­ant to judi­cial deci­sions.  Fur­ther, when a statute is amended those por­tions of the old law that are not repealed are regarded not as a new enact­ment but rather a con­tinua­tion of the old law.  
Jack­sonville
, 18 Ill. 2d at 622, 165 N.E.2d at 303.

Using these same principles of statutory construction, the language of the Illinois Munici­pal Code in its present form re­

tains the same meaning:  mu­nic­i­pal­i­ties have the au­thor­i­ty to sell power out­side their corpo­rate bound­aries subject to the limi­tation that a major por­tion of the elec­tric product be sup­

plied to the munici­palities or their in­habit­ants.  Thus, Sullivan does have the legal right to sell out­side its cor­porate bound­

aries subject to the above-noted limi­tation and to the waiv­er pro­vi­sion added in 1972, which is discussed below.   See 65 ILCS 5/11-117-1 (West 1996).

C.  Waiver

Plaintiff Cooperative further contends the trial court erred in finding the Agree­ment consti­tuted a written waiv­er with­in the meaning of section 11-117-1 of the Illinois Munici­pal Code.  The finding of a waiver is signif­icant because it indi­cates the Coop­

era­tive waived any enti­tlement to pro­vide elec­tri­cal service to the areas disputed in counts I and II, which in turn provides Sullivan with the right to service those disputed areas that lie out­side its corporate limits but within the "ex­ist­ing service territory."  

Plain­tiff ar­gues noth­ing con­tained in the Agree­ment can be rea­sonably inter­preted as a waiv­er.  Defen­dant con­tends there can be no clearer exam­ple of a written waiver than an agreement by the electric suppli­er, here the Coop­era­tive, that cer­tain areas are the "ex­ist­ing ser­vice ter­ri­to­ry" of Sullivan.   

As discussed above, the Illi­nois Mu­nic­i­pal Code per­mits Sullivan, a municipal corpora­tion, to own and oper­ate a mu­nic­ipal util­ity with­in its cor­po­rate lim­its.  65 ILCS 5/11-117-1 (West 1996).  Further, in 1972, the Illinois Munic­ipal Code was amend­ed to its present form.  Pub. Act 77-2465, §1, eff. October 1, 1972 (1972 Ill. Laws 1467-68).  This amend­ment added lan­guage that re­

quired mu­nici­pali­ties to receive a written waiv­er before ser­vic­

ing a new cus­tomer whom an elec­tric sup­pli­er was entitled to serve.  Pursu­ant to this amend­ment, municipali­ties are also per­

mit­ted to own and oper­ate power lines or substa­tions out­side the corpo­rate limits, but effective Octo­ber 1, 1972, "no new custom­er which an elec­tric supplier is entitled to serve under the Elec­

tric Suppli­er Act [(Ill. Rev. Stat. 1973, ch. 111 2/3, par. 401 
et
 
seq
. (now 220 ILCS 30/1 
et seq
. (West 1996)))] may be served from any line, lines or other facili­ties lo­cated with­out the corporate limits of a munic­ipality un­less waiv­er to serve such a customer is given in writ­ing by the electric suppli­er" (Ill. Rev. Stat. 1973, ch. 24, par. 11-117-1(2) (now 65 ILCS 5/11-117-1(2) (West 1996))).

"Waiver" is defined as "the intentional relinquish­ment of a known right."  
Illinois Valley Electric Co-Operative, Inc. v. City of Prince­ton
, 229 Ill. App. 3d 631, 638, 594 N.E.2d 347, 352 (1992).  Plain­tiff ar­gues the trial court did not spe­cifi­cally iden­ti­fy the part of the Agree­ment that consti­tuted a waiv­er.  How­ever, logic dic­tates the trial court need not point to a spe­

cific phrase or word in the Agree­ment to proper­ly find a waiv­er.  

The Agree­ment, when read as whole, con­sti­tutes a waiv­er. The Agreement on its face in the third re­cit­al indi­cates it was in­

tended to resolve terri­to­rial disputes be­tween Sullivan and the Cooperative.  The reso­lu­tion of a ter­ri­to­ri­al dis­pute nec­es­sar­i­ly sug­gests the concur­rent assign­ment and waiver of rights.  By assign­ing an "exist­ing ser­vice terri­tory" to Sullivan, the Cooper­ative con­cur­rent­ly re­lin­quished or waived its rights with respect to that same ter­ri­tory.  

We find no error in the trial court's determination the Agree­ment con­sti­tutes a waiv­er with­in the mean­ing of sec­tion 11-

117-1.

D.  Illinois Commerce Commission Approval

Plaintiff's final contention on appeal is the agree­ment is void be­cause the par­ties were required to secure the ap­prov­al of the Illinois Com­merce Commission (ICC) but failed to do so.

Defendant Sullivan argues plaintiff has waived any such argu­ment, since plaintiff did not raise the issue of ICC ap­prov­al until plaintiff's motion to recon­sider.  Defen­dant cor­rectly contends it is not proper to raise a new legal theory or factual argument in a motion for rehearing.  
Gardner v. Navistar Interna­

tional Transportation Cor­p.
, 213 Ill. App. 3d 242, 248-49, 571 N.E.2d 1107, 1111 (1991).  Thus, waiver ap­plies to the par­ties with respect to this legal is­sue.  However, we elect to consider this issue on appeal and, in so do­ing, we find plaintiff's argu­

ment is without merit.  

Plaintiff argues the Agreement is void for lack of ICC approval as required pursuant to the Elec­tri­c Sup­plier Act (Act) (Ill. Rev. Stat. 1991, ch. 111 2/3, pars. 401 through 416 (now  220 ILCS 30/1 through 16 (West 1996)).  De­fen­dant Sullivan cor­

rect­ly ar­gues it is not sub­ject to the Act; there­fore, the Agree­

ment does not require ICC ap­prov­al.

The Act requires "ser­vice area" agree­ments "be­tween electric suppliers" be approved by the ICC.  Ill. Rev. Stat. 1991, ch. 1112/3, par. 406 (now 220 ILCS 30/6 (West 1996)).  How­ev­er, Sullivan is not an "elec­tri­c sup­pli­er" with­in the mean­ing of the Act.  Ill. Rev. Stat. 1991, ch. 24, par. 403.5 (now 220 ILCS 30/3.5 (West 1996)).  There­fore, the Agree­ment in ques­tion is not a "ser­vice area" agreement with­in the meaning of the Act and is not required to have ICC approv­al.

Pursuant to section 6 of the Act: 

"Any 2 or more 
electric
 
suppliers
 may con­tract together defining and delineat­ing, as between themselves, one or more service areas in which each such con­tracting supplier shall be entitled to furnish ser­vice.  Such con­tracts are subject to the approval of the [ICC]."  (Emphasis added.)  Ill. Rev. Stat. 1991, ch. 1112/3, par. 406 (now 220 ILCS 30/6 (West 1996)).

The term "electric supplier" is defined as follows:  "'Elec­tric Supplier' or 'Supplier' means an electric cooperative or a public utility which furnishes electric service."  Ill. Rev. Stat. 1991, ch. 1112/3, par. 403.5 (now 220 ILCS 30/3.5 (West 1996)).  Sullivan, how­ev­er, is nei­ther an elec­tric cooperative nor a pub­

lic utility.

Section 3.4 of the Act defines the term "electric coop­er­a­

tive" to in­clude:

"(a) any 
not-for-prof­it cor­pora­tion
 or other person that owns, con­trols, operates or man­ages, directly or indi­rectly, within this State, any plant, equipment or property for the production, transmission, sale, de­livery or furnishing of electricity and (b) that either is or has been financed in whole or in part under the federal 'Rural Electri­fication Act of 1936' and the Acts amendatory thereof and supple­mentary thereto, or is directly or indirectly caused to be formed by any one or more such not-for-profit corpora­

tions or other persons that is or has been so fi­

nanced."  (Emphasis added.)  Ill. Rev. Stat. 1991, ch. 1112/3, par. 403.4 (now 220 ILCS 30/3.4 (West 1996)).

Based on the term "electric cooperative" as defined in the Act, Sullivan is not an electric cooperative.  

The Elec­tric Suppli­er Act defines a "public utility" as having "the same mean­ing as is defined in Section 10.3 of the Public Utili­ties Act."  Ill. Rev. Stat. 1991, ch. 1112/3, par. 403.14 (now 220 ILCS 30/3.14 (West 1996)).  Section 3-105 of the Public Utilities Act (formerly section 10.3) (Ill. Rev. Stat. 1991, ch. 1112/3, par. 3-105 (now 220 ILCS 5/3-105 (West 1996))) de­fines "public util­ity" and pro­vides in pertinent part:

"'Public Utility' does not include however:

1.  public utilities that are owned and oper­ated by any political subdivision, public institution of higher education or municipal corporation of this State, or public utili­ties that are owned by such political subdi­vision, public institution of higher educa­tion, or municipal corporation and oper­ated by any of its lessees or operating agents ***."

Thus, Sullivan, a municipal corporation, is expressly ex­clud­ed from the definition of a public utility, re­moving it from the pur­view of the Act.

Equally important, the Act expressly pro­vides: "Noth­ing in this Act shall be con­strued to im­pair, abridge, or dimin­ish in any way the powers, rights and privileges of in­corpo­rated munici­

palities."  Ill. Rev. Stat. 1991, ch. 111 2/3, par. 414 (now 220 ILCS 30/14 (West 1996)).

In sum, ICC approval is not re­quired be­cause the Agree­ment reached be­tween the Coop­er­a­tive and Sullivan does not fall within the scope of the Act as Sullivan, a mu­nicipal cor­po­ra­tion, is not an electri­cal sup­pli­er with­in the mean­ing of the Act.

Based on the preceding analysis, we find (1) the Agree­ment is clear and unam­big­u­ous on its face; (2) the Illinois Mu­nicipal Code gives Sullivan the legal right to provide elec­tric service outside its corporate bound­aries with a waiver from the electric supplier; (3) the Agreement constitutes a waiver with­in the mean­ing of the Illinois Municipal Code; and (4) the Agreement is not void for lack of ICC approval.  For the fore­going rea­sons, we hold dis­missal herein was proper as a matter of law. 

Affirmed.

McCULLOUGH, J., concurs.

COOK, J., specially concurs.

JUSTICE COOK, specially concurring:

The Agreement between Sullivan and the Cooperative does a number of things.  It recognizes that Sullivan has the power to provide service outside the existing city limits, it resolves a dispute as to the Elder Tract and provides compensa­tion for the Cooperative's assets there, and it establishes a method for re­

solving future disputes as to other areas and pro­viding compen­

sation for the Cooperative.  The Agreement in sever­al places refers to annexation.  Some portions of the Agreement, such as paragraph 5, use annexation as the point in time at which the turnover of service becomes effective and the right to com­pensa­

tion comes into being.  The Agreement does not mention that a city has some ability to supply electric power outside its bound­

aries without annexing the area to which power is supplied.  See
 
Jacksonville
, 18 Ill. 2d 618, 165 N.E.2d 300.  Absent clear lan­

guage I do not read the Agreement as requir­ing Sullivan to pro­

ceed by way of annexation and prohibiting Sullivan from using other legitimate methods to supply power outside its boundaries.  There is no indication in the Agree­ment that it makes any differ­

ence to the Cooper­a­tive which method Sullivan uses, and the ref­

erence to annex­ation is simply a reference to Sullivan's decision to begin supply­ing power, however that decision is carried out. 

An important part of the Agreement, for purposes of this case, is paragraph 5.  That paragraph provides that when Sullivan annexes territory in the future it will enter into nego­tia­tions to purchase the Cooperative's facilities, "if that ter­rito­ry had been within the service territory of the Coopera­tive."  Apparently there is no obligation to purchase facilities that are within the service territory of Sullivan, as shown on Appen­dix B.  Apparently at the time of the Agreement the Cooper­a­tive did not have much in the way of facilities in what was designated as Sullivan's existing service territory.  If the Cooper­ative has no right to compensation for its facilities, what difference does it make to the Cooperative whether Sullivan pro­ceeds by way of an­

nexation or by some other method?  

Paragraph 3 of the Agreement provides that the parties have agreed to their existing service areas as of the date of the Agreement, as shown on Appendix B.  I would be will­ing to listen to any evidence that Appendix B was not accurate and that the Cooperative actually was furnishing service to some areas listed as being within Sullivan's service area.  I agree with the trial court, however, that affidavits by the Cooperative's employees that the Agreement simply was not in accor­dance with the parties' intent are inadmissible.  It does not appear that the Cooperative was furnishing service either to what is now to be Schable Acres Subdivision, or to the property in the northeast quarter of sec­

tion 23.  At most it appears that no one was furnishing power to those areas, and perhaps that was why the Cooperative had no objection to those areas being includ­ed within Sullivan's service area.  

The Cooperative has recognized Sullivan's right to furnish power to Schable Acres and to the property in the north­east quarter of section 23.  The Cooperative apparently has no facili­

ties in those areas, and the Agreement makes it clear the Cooper­

ative is not entitled to any compensation for facili­ties in those areas.  What complaint does the Cooperative have if Sullivan chooses to supply power to those areas without annex­ation, if it is able to do so in some other manner?  I do not read the Agreement to allow the Cooperative to insist upon annex­ation in this case.  It appears the Cooperative is relying upon a techni­

cality to avoid complying with its agreement now that sig­nifi­cant service to these areas will be required.